Barbara J. **DAHLIN**, Plaintiff,

v.

**METROPOLITAN LIFE INSURANCE COMPANY**, Defendant.

No. C01–4120–MWB.

United States District Court,
N.D. Iowa,
Western Division.

April 9, 2003.

Kelly K. Salker, Berenstein Moore Berenstein Heffernan & Moeller, LLP, Sioux City, IA, for Plaintiff.

Jaki K. Samuelson, J. Campbell Helton, Whitfield & Eddy, PLC, Des Moines, IA, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING PARTIES' MOTIONS FOR SUMMARY JUDGMENT**

BENNETT, Chief Judge.

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ....................................990
    A.   Procedural Background..............................................990
    B.   Factual Background................................................990

II. LEGAL ANALYSIS ...................................................995
    A.   Standards For Summary Judgment ...................................995
    B.   Standard Of Review ...............................................996
    C.   MetLife's Interpretation Of The Plan ..............................997
        1.  Interpretation of the Plan consistent with its goals ...................999
        2.  Interpretation of the Plan consistent with the ERISA ...............1000
        3.  Interpretation of the Plan consistent with earlier interpretations....1000
        4.  Interpretation of the Plan renders any language internally inconsistent ...............................................................1000
        5.  Interpretation of the Plan is contrary to the clear language of the Plan ....................................................................1001
    D.   Substantial Evidence ..............................................1002
        1.  Dahlin's contentions .............................................1002
        2.  Basis for MetLife's determination .................................1002
        3.  Dahlin's contrary evidence .......................................1003
        4.  Social Security ...................................................1004

III. CONCLUSION ......................................................1005

## I. INTRODUCTION AND BACKGROUND

### A. Procedural Background

On November 29, 2001, plaintiff Barbara J. Dahlin filed a complaint against Metropolitan Life Insurance Company ("MetLife"), to recover long-term disability ("LTD") benefits under a employee benefits plan provided by MetLife to her former employer. On October 15, 2002, Dahlin filed a motion for summary judgment. In her motion for summary judgment Dahlin argues that in this case there is no genuine issue as to any material fact that the plan administrator improperly interpreted the terms of the plan, that the plan administrator's decision is unreasonable, and that the plan administrator's decision is not supported by substantial evidence. (Doc. No. 18). On October 16, 2002, MetLife filed a cross-motion for summary judgment. MetLife argues that Dahlin is unable to create a genuine issue of any material fact that the plan administrator properly interpreted the terms of the plan, that the plan administrator's decision was reasonable, and that the plan administrator's decision is supported by substantial evidence. (Doc. No. 19). MetLife requested oral argument on the motions. However, the court concluded that oral argument was unnecessary for the disposition of these matters because of the completeness of the record and the thoroughness of the parties' briefs.

The court turns first to a discussion of the undisputed and disputed facts as shown by the record and the parties' sub-missions, then to consideration of the standards applicable to motions for summary judgment, and, finally, to the legal analysis of whether either party is entitled to summary judgment.

### B. Factual Background

The court will not attempt to provide here an exhaustive dissertation of the undisputed and disputed facts. The court will, instead, provide sufficient facts, disputed and undisputed, to put the parties' arguments for and against summary judgment into proper context.

Plaintiff Barbara J. Dahlin was an employee of American Marketing Industries Incorporated ("AMI").[1] MetLife's Appendix in Support of Summary Judgment ("Defendant's Appendix"), Doc. No. 24 at 30–31.[2] While working for AMI, Dahlin's duties included directing, supervising, and coordinating the production of AMI's products (sporting goods and marketing items) in an assigned area. Defendant's Appendix, Doc. No. 24 at 32–33. As an employee of AMI, Dahlin was a participant in AMI's employees' benefits plan ("the Plan"). The Plan is an employee benefits plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001 et. seq. ("ERISA"). Plaintiff Dahlin was furnished with a copy of the summary plan description ("SPD") which described, among other things, eligibility requirements for LTD benefits under the Plan. The SPD's definition for "disability" or "disabled" under its LTD benefits section is as follows:

---

1. Some of the submitted documents indicate that Dahlin was a production supervisor for K–Products, Inc., Defendant's Appendix, Doc. No. 24 at 45; others refer to AMI, Defendant's Appendix, Doc. No. 24 at 30–31; and still others refer to both K–Products and AMI, Defendant's Appendix, Doc. No. 24 at 49. For purposes of this order, the court will consider these two entities as one employer, which the court will identify simply as "AMI."

2. Much of the information cited by the court is contained within both parties' submitted appendices. The court will cite only to the first properly paginated appendix.

DISABILITY or DISABLED: [M]eans through the Elimination Period and for the next 24 months, the Insured cannot perform the essential duties of his or her regular occupation on a full-time basis because of Sickness or Injury.

After benefits have been paid for 24 months, the Insured cannot perform the essential duties of any occupation for which he or she is reasonably fitted by training, education or experience on a full-time basis.

Defendant's Appendix, Doc. No. 24 at 15. The SPD also provides a definition of elimination period:

ELIMINATION PERIOD: The Elimination Period is 180 days of Disability. It begins on the first day of Disability. The Insured may work full time for 14 days or less during the Elimination Period without starting a new Elimination Period. These days will not count as satisfying the Elimination Period. An Insured who works full time for more than 14 days must begin a new Elimination Period.

Defendant's Appendix, Doc. No. 24 at 15. Further, the SPD states that LTD benefits will begin "after the end of the Elimination Period." *Id.*

In March 1997, Dahlin began to experience respiratory problems apparently caused by a malfunctioning furnace unit in her home. Defendant's Appendix, Doc. No. 24 at 66. On March 31, 1997, Dahlin was seen at the emergency room of the Hawarden Community Hospital and was diagnosed with having dyspnea.[3] Defendant's Appendix, Doc. No. 24 at 65. Dr. L. Willekes saw Dahlin regarding Dahlin's respiratory problems and referred Dahlin to Dr. Bacon for further diagnosis and treatment. Defendant's Appendix, Doc. No. 24 at 66. On April 4, 1997, Dahlin had

her first appointment with Dr. Bacon for diagnosis and treatment of her respiratory problems. Dr. Bacon's initial impression was that Dahlin "very likely [had] bronchospasm and hyperactive airways disease." Defendant's Appendix, Doc. No. 24 at 67. On April 25, 1997, Dahlin was again seen by Dr. Bacon and Dr. Bacon wrote in Dahlin's progress report, "She does well on days she's out of the house as well as when she is at work." Defendant's Appendix, Doc. No. 24 at 68. On June 10, 1997, after another visit with Dahlin, Dr. Bacon wrote in Dahlin's progress report, "She did well during her trip to CO although with minimal activity she did get somewhat dyspneic and hyperventilate [sic]. This was likely related to the decreased 02 concentration." Defendant's Appendix, Doc. No. 24 at 69. On June 16, 1997, Dahlin had a follow-up visit with Dr. Bacon. Dr. Bacon noted in Dahlin's progress report that Dahlin was "off steroids now" and that Dahlin "does notice that when she uses inhalers that she can premedicate before exposures with a benefit." Defendant's Appendix, Doc. No. 24 at 69. On July 13, 1998, Dahlin was again seen by Dr. Bacon. Dr. Bacon's report stated, "IMPRESSION: Reactive airway dysfunction syndrome under fairly good control at present. She is planning to go to Spain this fall and I think she'll be able to do well with the trip.... We'll see her back in late August or early September prior to leaving on her trip." Defendant's Appendix, Doc. No. 24 at 74. On January 16, 1998, Dr. Bacon recorded in Dahlin's progress report, "She's continu[ing] to have some difficulties particularly when she's around perfume[,] dust & smoke.... All in all think she's holding fairly steady." Defendant's Appendix, Doc. No. 24 at 70.

---

**3.** Defined as "shortness of breath;" "a subjective difficulty or distress in breathing, usually associated with disease of the heart or lungs; occurs normally during intense physical exertion or at high altitude." *Stedman's Medical Dictionary* 480 (25th ed.1990).

In addition to being referred by Dr. Willekes to Dr. Bacon, Dahlin was also referred by Dr. Willekes to Dr. Ashraf Elshami for consultation and a second opinion as to whether Dahlin had dyspnea. On March 24, 1998, Dahlin was seen by Dr. Elshami at the Central Plains Clinic. Dr. Elshami's report contained the following:

> Triggers of her symptoms include fumes, perfume, flowers, and particularly cold air. She also works in a cap factory and is exposed to a lot of lint and dye.... As far as triggers of her reactive airways disease, this can certainly be due to triggers in the work environment, although this cannot be said with 100% certainty.

Defendant's Appendix, Doc. No. 24 at 71–72.

On October 29, 1999, Dahlin went to the emergency room complaining of tightness in her chest. Defendant's Appendix, Doc. No. 24 at 75–76. She was treated and released. On November 11, 1999, Dahlin was seen by Dr. Willekes. Dr. Willekes's report included the following:

> She was having significant breathing problems and related a lot of it to exposure to some new chemicals at work. She is doing a little bit better now but is still very tight. She is on a regimen where she uses Serevent twice a day and Combivent other times through the day as well as a nebulizer that seems to settle things down for her. She has not been on any inhaled steroids for a while and we probably should reinstitute that at this point.

Defendant's Appendix, Doc. No. 24 at 77.

As Dahlin began to prepare to apply for LTD benefits, Dr. Bacon was requested to fill out MetLife's attending physician's statement form. On February 2, 2000, Dr. Bacon filled out the attending physician's statement form and he wrote on the form that Dahlin should "avoid chemicals, dust, smoke, heavy lifting." Defendant's Appendix, Doc. No. 24 at 35. Dr. Bacon also marked on the form that Dahlin had "improved" and as to physical impairments, he marked "Class 4—Moderate limitation of functional capacity; capable of clerical/administrative (sedentary*) activity. (60–70%)." Defendant's Appendix, Doc. No. 24 at 35. Further, Dr. Bacon wrote on the form that Dahlin's "work is limited by dyspneic; Airway irritants cause more problems than work load." Defendant's Appendix, Doc No. 24 at 35.

In addition to filling out the attending physician's statement form, as part of Dahlin's application process for LTD benefits, Dr. Bacon also wrote a letter regarding Dahlin's respiratory problems. This letter was dated February 7, 2000 and addressed, "To Whom It May Concern." Dr. Bacon wrote in the letter the following:

> In review of the different chemicals and substances that Barb Dahlin is exposed to at the workplace, I think it is possible that multiple different activities may be contributing to some of her bronchospastic problems. I think these would include dust and lint, some of the dyes, and the cleaning solvents also may be causing problems. The glue, the flux in the hot glue being used may also contribute to some of her shortness of breath. I think she should try to avoid exposure to all of these agents in order to improve her shortness of breath. In addition, she has difficulty when exposed to strong perfumes and other aromas which makes her job as training [sic] new employees even more difficult.

Defendant's Appendix, Doc. No. 24 at 64.

On February 18, 2000, Dahlin submitted her application for LTD benefits to Met-Life. She stated on the application for LTD benefits the following basis for her claim:

Accident happened in our home. Nature of illness was shortness of breath, fatigue, headaches, sore throats, exhaustion, weakness, trouble sleeping, lack of energy, tight[ness] of ch[est].

Defendant's Appendix, Doc. No. 24 at 34. In her application she claimed that she was first treated for her illness or injury on March 31, 1997. Defendant's Appendix, Doc. No. 24 at 34. She also indicated on her application for LTD benefits that she had been working on a part-time basis from January 3, 2000, through January 17, 2000 and had been unable to work because of her disability since January 27, 2000. Defendant's Appendix, Doc. No. 24 at 34.

After Dahlin filed her application for LTD benefits she continued to be seen by Dr. Bacon for treatment of her respiratory problems. The court assumes that since these medical records were discussed by the parties in their briefs and included in the parties' appendices, that these medical records were also available to MetLife when it considered Dahlin's application for LTD benefits. In order to maintain a chronological understanding of the processing of Dahlin's LTD benefits application and her continued medical treatment, the rest of the factual background integrates, chronologically, MetLife's communications with Dahlin and Dahlin's continued medical treatment.

On February 28, 2000, Dahlin was seen by Dr. Bacon and Dr. Bacon wrote in Dahlin's progress notes, "She has good air exchange. Plan to have her continue on her current medications. She is currently applying for disability which I think is appropriate. Apparently her employer is working with her on this. I will plan to see her back in 3 months." Defendant's Appendix, Doc. No. 24 at 81.

On April 17, 2000, Dahlin, as part of her LTD benefits application, submitted a "Claim Statement Supplement." As part of this supplement she stated:

I am unable to perform duties when exposed to dust, lint, dyes, cleaning solvents, glue, perfumes, and other aromas.

Defendant's Appendix, Doc. No. 24 at 37.

On May 9, 2000, Dr. Bacon again saw Dahlin and Dr. Bacon wrote in Dahlin's progress report, "[Dahlin] and Dennis [her husband] have been trying to walk over the last 2–3 months and have been doing a little bit better, although they had to stop recently due to the yard sprays and chemicals." Defendant's Appendix, Doc. No. 24 at 70. On May 12, 2000, Dahlin reported during a telephonic interview with a MetLife specialist that she "can't be outside, anything with an odor bothers her, can't go anywhere" and that she no longer had hobbies of "flowering and gardening." Defendant's Appendix, Doc. No. 29 at 49.

When MetLife received Dahlin's records it reviewed her information. On May 15, 2000, a file review was conducted by a MetLife disability specialist and a recommendation report was prepared. This report included the following comments, "Basically my impression is there is no disability from her own occ[upation] rather, it is an environmental issue. I do not feel claim is payable." Dahlin's Appendix in Support of Resistance ("Plaintiff's Resistance Appendix"), Doc. No. 34 at 11. On May 22, 2000, MetLife requested Intracorp have a vocational counselor review Dahlin's submitted information. Defendant's Appendix, Doc. No. 24 at 43. On May 26, 2000, Intracorp had Dahlin's file reviewed by a rehabilitation specialist. The report included the following:

A review of industrial applications where the Production Supervisor would likely be employed, [sic] reveals probable industries where most or all of the substances identified by Dr. Bacon are unlikely to exist. Industries where these jobs should exist include Beverage Bottling, Electrical Equipment Assembly,

Paper Goods Packaging, and the Wholesale Trade.

It is probable that jobs exists [sic] where the Production Supervisor can perform the essential duties of those jobs without being exposed to the lengthy list of substances identified by Dr. Bacon. My search suggests that at least the four industries identified above would provide a good opportunity for Production Supervisor jobs within Ms. Dahlin's issued restrictions.

Defendant's Appendix, Doc. No. 24 at 44–46.

During the time period that MetLife was in the process of reviewing Dahlin's LTD benefits application, Dr. Bacon referred Dahlin to Amy Salem, a physical therapist with Hawarden Community Hospital, for pulmonary exercise. Plaintiff's Resistance, Doc. No. 34 at 112. In June 2000, Salem was to work with Dahlin three times a week for thirty days. Plaintiff's Resistance, Doc. No. 34 at 112. On June 9, 2000, Salem noted on the treatment evaluation form, "Barb's brother-in-law was sick and they had to travel to New York. She is going to call when she returns back to town." Defendant's Appendix, Doc. No. 24 at 82. On June 19, 2000, Salem noted on the treatment evaluation form, "Barb states that she was on vacation. She notes that after walking for an extended period of time, especially in the mall she was experiencing lower leg pains." Defendant's Appendix, Doc. No. 24 at 82. Also during this time period, Dr. Bacon referred Dahlin to Alice Waterman, a therapist with Hawarden Community Hospital, for pulmonary rehabilitation. Plaintiff's Resistance, Doc. No. 34 at 113. On June 19, 2000, Waterman wrote on Dahlin's pulmonary rehabilitation progress sheet from the cardiopulmonary rehabilitation department:

Just returned from trip to New York. Her biggest complaint was walking long distance.... She's improving significantly ... relaxing her upper body more. Diaphragmatic breathing is also improving. We talked about asthma and reactive airway today. Barb maintains her environment very well ... filters in the home, wearing masks when working outside such as mowing.

Plaintiff's Resistance Appendix, Doc. No. 34 at 140.

On June 26, 2000, MetLife informed Dahlin by letter of the denial of her claim for LTD benefits:

We have reviewed the information contained in your file and establish that you had limitations and restrictions which precluded you from performing the material duties of a Production Supervisor at AMI. However, we have received information that you could perform the duties of a Production Supervisor in another work environment which doesn't expose you to substances indicated by your physician (examples: Beverage Bottling, Electrical Equipment Assembly, Paper Goods Packaging and Wholesale Trade).

Your claim is being denied on the basis that you are not considered totally disabled from your own occupation as a Production Supervisor in general.

Defendant's Appendix, Doc. No. 24 at 48.

Dahlin appealed this decision and MetLife reconsidered the claim. MetLife requested a rehabilitation consultant review the file and conducted a labor market survey in the Hawarden, Iowa, area. Defendant's Appendix, Doc. No. 24 at 54–56. The labor market survey identified three industries in that area that had positions similar to Dahlin's position at AMI. These industries were Beverage Bottling, Electrical Equipment, and Wholesale Trade. The labor survey identified nine different potential employers. When surveyed these potential employers stated they would con-

sider hiring someone with Dahlin's work experience. On February 12, 2001, Met-Life again denied Dahlin's claim stating:

> We requested a detailed labor market survey which has found Production Supervisor positions existing with several employers in other business industries, such as Beverage Bottling, wholesale and Electrical Assembly. Employers in each of these fields were able to confirm that their respective work environments were not subject to strong fumes. These positions would allow you to work within your medical restrictions.

Defendant's Appendix, Doc. No. 24 at 52.

On March 8, 2001, Dahlin requested further consideration. Defendant's Appendix, Doc. No. 24 at 59. On March 13, 2001, MetLife informed Dahlin that it was again reviewing her claim. Defendant's Appendix, Doc. No. 24 at 59. MetLife determined that Dahlin could work elsewhere, and therefore was not disabled under the Plan. On May 14, 2001, MetLife reaffirmed its denial and informed Dahlin, "This determination is the final decision on review and constitutes completion of the full and fair review required by the Plan and by federal law. Please be advised that under the provisions of the Plan, no further administrative appeals are available." Defendant's Appendix, Doc. No. 24 at 61. The present lawsuit followed on November 29, 2001.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

This court has considered in some detail the standards applicable to motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure in a number of prior decisions. See, e.g., Swanson v. Van Otterloo, 993 F.Supp. 1224, 1230–31 (N.D.Iowa 1998); Dirks v. J.C. Robinson Seed Co., 980 F.Supp. 1303, 1305–07 (N.D.Iowa 1997); Laird v. Stilwill, 969 F.Supp. 1167, 1172–74 (N.D.Iowa 1997); Rural Water Sys. # 1 v. City of Sioux Ctr., 967 F.Supp. 1483, 1499–1501 (N.D.Iowa 1997), aff'd in pertinent part, 202 F.3d 1035 (8th Cir.2000), cert. denied, 531 U.S. 820, 121 S.Ct. 61, 148 L.Ed.2d 28 (2000); Tralon Corp. v. Cedarapids, Inc., 966 F.Supp. 812, 817–18 (N.D.Iowa 1997), aff'd, 205 F.3d 1347 (8th Cir.2000) (Table op.); Security State Bank v. Firstar Bank Milwaukee, N.A., 965 F.Supp. 1237, 1239–40 (N.D.Iowa 1997); Lockhart v. Cedar Rapids Community Sch. Dist., 963 F.Supp. 805 (N.D.Iowa 1997). The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> Rule 56. Summary Judgment
>
> (a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment in the party's favor upon all or any part thereof.
>
> (b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.
>
> (c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

Fed.R.Civ.P. 56(a)-(c) (emphasis added).

Applying these standards, the trial judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of

the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir.1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman*, 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, ·106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). As to whether a factual dispute is "material," the Supreme Court has explained, "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rouse v. Benson*, 193 F.3d 936, 939 (8th Cir.1999); *Beyerbach v. Sears*, 49 F.3d 1324, 1326 (8th Cir.1995); *Hartnagel*, 953 F.2d at 394. If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir.1997). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give the party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 587, 106 S.Ct. 1348; *Quick*, 90 F.3d at 1377. With these standards in mind, the court turns to consideration of the parties' cross-motions for summary judgment.

### B. Standard Of Review

■ "A court normally gives plan administrators considerable leeway to interpret and apply plan rules." *Allison v. Wellmark*, 153 F.Supp.2d 1023, 1027 (N.D.Iowa 2001). This court will set aside

plan administrator decisions only if the decisions are "arbitrary, capricious, or an abuse of discretion." *Fletcher–Merrit v. NorAm Energy Corp.*, 250 F.3d 1174, 1179 (8th Cir.2001). The United States Supreme Court, however, has instructed that this deferential standard of review is appropriate only where the "benefit plan" gives discretionary authority to determine eligibility for benefits or to construe the terms of the benefit plan to the plan administrator. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see Riedl v. General Am. Life Ins. Co.*, 248 F.3d 753, 755 (8th Cir.2001); *Lynn*, 886 F.2d at 187. In *Bruch*, the Supreme Court held that, under the ERISA, absent the express delegation of discretion to a plan trustee, a court should conduct a *de novo* review of the trustee's benefit determination. *Bruch*, 489 U.S. at 115, 109 S.Ct. 948; *Riedl*, 248 F.3d at 755; *see Jacobs v. Pickands Mather & Co.*, 933 F.2d 652, 656 (8th Cir.1991).

Consequently, the Eighth Circuit Court of Appeals has developed a well-settled framework for review of the denial of benefits under the ERISA plans, as follows:

> The standard under which we review a plan administrator's or fiduciary's decision to grant or deny benefits depends upon whether "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). Where, as here, the benefits plan explicitly grants such discretionary authority to a fiduciary, we review the fiduciary's eligibility determination for an abuse of discretion.

*Jackson v. Metro. Life Ins. Co.*, 303 F.3d 884, 889 (8th Cir.2002).

Here, the SPD gives Metlife the authority to interpret the Plan's provisions:

[MetLife] shall have the sole discretion and authority to construe the terms of the Policy and resolve all disputes, claims, and all questions of eligibility under the Policy. The decision of [Met-Life] shall be final and binding on all parties, except as otherwise provided by law.

Defendant's Appendix, Doc. No. 24 at 23. As the SPD contains an express delegation of discretion to MetLife, the court will employ the abuse of discretion standard here in reviewing MetLife's interpretation of the Plan. *Jackson,* 303 F.3d at 889.

■ The Eighth Circuit Court of Appeals has also explained, as follows, the nature of "abuse of discretion" review that is applicable in cases such as this:

Under the abuse of discretion standard, "the proper inquiry is whether the plan administrator's decision was reasonable; i.e., supported by substantial evidence."

. . . . .

The requirement that the fiduciary's decision be reasonable should be read to mean that a "decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision." *Donaho,* 74 F.3d at 899.

*Id.* at 887. Thus, under this deferential standard, the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if the court itself would have reached a different conclusion. *See Bruch,* 489 U.S. at 115, 109 S.Ct. 948, 103 L.Ed.2d 80. "Put another way, the [administrator's] decision need not be the only sensible interpretation, so long as its decision offer[s] a reasoned explanation, based on the evidence, for a particular outcome." *Delta Family–Care Disability and Survivorship Plan v. Marshall,* 258 F.3d 834, 841 (8th Cir.2001), *cert. denied,* 534 U.S. 1162, 122 S.Ct. 1173, 152 L.Ed.2d 117 (2002). On the other hand, the Eighth Circuit

Court of Appeals has defined an interpretation that would be an abuse of discretion as one that is "extremely unreasonable." *Kennedy v. Georgia–Pacific Corp.,* 31 F.3d 606, 609 (8th Cir.1994).

■ At the outset, it is also worth noting that the scope of this court's review is limited to the evidence that was before the ERISA plan administrator at the time the plan administrator made the decision to deny benefits. *Cash v. Wal–Mart Group Health Plan,* 107 F.3d 637, 641 (8th Cir.1997). Because both parties agree that in this case there is no question that the ERISA governs the Plan, the court will now turn to consider whether MetLife's plan administrator's interpretation of the Plan was improper and whether the decision to deny LTD benefits was supported by substantial evidence.

### C. MetLife's Interpretation Of The Plan

■ It appears to the court that MetLife interprets the Plan language "regular occupation," under the first prong in the definition of disability, not only as Dahlin being unable to perform the essential duties of "regular occupation" on a full-time basis at AMI, but also as Dahlin being unable to perform the essential duties of that occupation at any other employer. The court emphasizes that "a court normally gives plan administrators considerable leeway to interpret and apply plan rules." *Allison v. Wellmark,* 153 F.Supp.2d 1023, 1027 (N.D.Iowa 2001). Additionally, when the Plan, as in this case, expressly delegates the authority to construe the terms of the Plan to the plan administrator, this invokes a deferential standard. Even considering this deferential standard, the court raises, *sua sponte,* the issue of whether MetLife's interpretation of "cannot perform the essential duties of his or her regular occupation on a

full-time basis because of Sickness or Injury" was reasonably interpreted. The court notes that the Plan language is ambiguous as to whether "regular occupation" means her job as a production supervisor at AMI or any comparable production supervisor job with another employer. However, given the deferential standard, and the fact that Dahlin failed to argue that the Plan language should be interpreted as restricting her to being able to perform the essential duties of her regular occupation only at AMI, the court cannot say this interpretation is unreasonable.[4]

Dahlin does argue that MetLife has improperly interpreted the definition of "disabled," and, therefore, abused its discretion.

The SPD's definition for "disability" or "disabled" is as follows:

DISABILITY or DISABLED: [M]eans through the Elimination Period and for the next 24 months, the Insured cannot perform the essential duties of his or her regular occupation on a full-time basis because of Sickness or Injury.

After benefits have been paid for 24 months, the Insured cannot perform the essential duties of any occupation for which he or she is reasonably fitted by training, education or experience on a full-time basis.

Defendant's Appendix, Doc. No. 24 at 7. There are two prongs to the SPD's definition of "disabled." The first prong requires that "through the Elimination Period and for the next 24 months, the Insured cannot perform the essential duties of his or her regular occupation on a full-time basis because of Sickness or Injury." The second prong requires that "the Insured cannot perform the essential duties of any occupation for which he or she is reasonably fitted by training, education or experience on a full-time basis." MetLife had no need to consider the second prong of this definition because Dahlin filed for LTD benefits on February 18, 2000 and her last day of work due to disability was January 27, 2000, therefore, the elimination period, 180 days, as required under the Plan's "disability" definition, had not yet expired.

When interpreting the Plan, MetLife reviewed the SPD's definition and determined that if an insured failed the first prong, the insured would not qualify for disability benefits. Dahlin argues that the evidence shows that she is disabled and therefore MetLife's interpretation of "disabled" is improper. However, Dahlin has failed to recognize that there is a distinction between the argument that MetLife "improperly interpreted" the Plan, *i.e.*, failed to construe or give proper meaning to the language of the Plan, and the argument that there was not "substantial evidence" to support the plan administrator's determination that she did not fit the definition of disabled as correctly or reasonably interpreted. Put another way, the issue of whether Dahlin is "disabled" within the meaning of the Plan, in the sense that she can or cannot work as a production supervisor, in another environment, is

---

4. When interpreting an occupational disability insurance policy, the term "regular occupation" is reasonably construed to mean "a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties." *See Sullivan v. Trilog Inc., Ins. Plan,* 2002 WL 31496421, *3 (N.D.Iowa). However, in the Fifth Circuit, when construing the language of the ERISA plans, courts are directed to follow "the doctrine of *contra profer-* *entem,"* and if language of a plan remains ambiguous, after applying ordinary principles of contract interpretation, courts are to construe the language strictly in favor of the insured. Where the term "regular occupation" is not defined in the Plan, "a fiduciary must adopt an appropriate description of the claimant's occupation." *See House v. American United Life Ins. Co.,* 2002 WL 31729483 (E.D.La.).

an issue of "substantial evidence" before the plan administrator. Thus, in this case, when the court is considering whether MetLife "improperly interpreted" the Plan, it must consider whether MetLife considered the language of the SPD. When the court turns to consider whether Dahlin could or could not work as a production supervisor, in another environment, it will consider whether there was "substantial evidence" to support MetLife's denial of LTD benefits.

The court has previously discussed the five factor analysis the Eighth Circuit Court of Appeals has instructed courts to consider when determining whether the interpretation by a plan administrator is an abuse of the plan administrator's discretion. *See Allison v. Wellmark*, 153 F.Supp.2d 1023, 1028–33 (N.D.Iowa 2001). The Eighth Circuit Court of Appeals continues to instruct that these five factors are to be considered in determining the reasonableness of a decision maker's interpretation of a benefits plan. *Ferrari v. Teachers Ins. and Annuity Assoc.*, 278 F.3d 801, 808 n. 4 (8th Cir.2002) (citing *Cash v. Wal–Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir.1997)). These five factor are:

> 1) whether the decision-maker's interpretation of the plan is consistent with goals of the plan; 2) whether the decision-maker's interpretation conflicts with the substantive or procedural requirements of the ERISA statute; 3) whether the decision-maker has interpreted the relevant terms consistently; 4) whether the interpretation renders any language in the plan meaningless or internally inconsistent; and 5) whether the interpretation is contrary to the clear language of the plan.

*Id.* The court, in determining whether the interpretation by MetLife's plan administrator was an abuse of the plan administra-

tor's discretion, will consider these five factors.

### 1. Interpretation of the Plan consistent with its goals

The first factor the court will consider is whether MetLife's interpretation of the Plan was consistent with the Plan's goal. *Ferrari*, 278 F.3d at 808 n. 4. The SPD states:

> [MetLife] will pay the Net Monthly Benefit when proof is received that an Insured is Disabled. The Disability must:
> - result from Sickness or Injury;
> - require the regular attendance of a Physician;
> - result in a loss of income; and
> - begin while the Insured is covered under the Policy.

MetLife's Appendix, Doc. No. 24 at 15. Thus, the goal of the plan is to pay LTD benefits to insured persons who are disabled as defined by the Plan.

The SPD's LTD definition of disabled contains two prongs. The first prong is:

> DISABILITY or DISABLED means through the Elimination Period and for the next 24 months, the Insured cannot perform the essential duties of his or her regular occupation on a full-time basis because of Sickness or Injury.

MetLife's Appendix, Doc. No. 24 at 15. The second prong is:

> After benefits have been paid for 24 months, the Insured cannot perform the essential duties of any occupation for which he or she is reasonably fitted by training, education or experience on a full-time basis.

*Id.* MetLife determined that Dahlin could perform the essential duties of her regular occupation on a full-time basis, just not at AMI, which is consistent with the Plan's goals. MetLife had no need to consider the second prong because Dahlin had not been paid benefits for 24 months. The

court agrees that to award LTD benefits to a person who the plan administrator determined did not meet the language of the Plan would be inconsistent with the Plan's goals of awarding LTD benefits to persons who are disabled.

■ Dahlin contends that she plainly fits the first prong of the definition of disability because she cannot work as a production supervisor at AMI, nor can she work as a production supervisor with another employer, therefore, she cannot perform the essential duties of her regular occupation on a full-time basis and is disabled under the Plan. Again, the court distinguishes the issue of MetLife's interpretation of the Plan's language and the issue of whether there is "substantial evidence" that Dahlin can or cannot perform her regular occupation. The court has reviewed MetLife's interpretation and whether this interpretation is consistent with the goals of the Plan and concludes that because MetLife considered the language of the Plan and the definition of "disabled," MetLife's interpretation fits with the goal and purpose of the Plan.

### 2. Interpretation of the Plan consistent with the ERISA

The second factor requires the court to consider whether MetLife's interpretation conflicts with the substantive or procedural requirements of the ERISA statute. *Ferrari*, 278 F.3d at 808 n. 4. Here, plaintiff Dahlin has not identified any substantive or procedural requirements of the ERISA that are in conflict with MetLife's interpretation of the Plan's LTD benefits provision. Based on the court's review, the court finds that the Plan satisfies all the ERISA requirements.

### 3. Interpretation of the Plan consistent with earlier interpretations

As for the third factor, "whether the decision-maker has interpreted the relevant terms consistently," *Ferrari*, 278 F.3d at 808 n. 4, there is no evidence that MetLife has interpreted the Plan's LTD benefits provision at issue here either differently or in the same way in other cases. Thus, this factor points out no infirmity in MetLife's interpretation.

### 4. Interpretation of the Plan renders any language internally inconsistent

The fourth factor in the analysis requires the court to consider whether MetLife's interpretation renders any language of the Plan meaningless or internally inconsistent. *Ferrari*, 278 F.3d at 808 n. 4. Plaintiff Dahlin directs this court's attention to two non-Plan documents, the "Disability Payment Options" form [5] and an

5. The "Disability Payment Options form, in pertinent part, states:

> The policy under which you are covered provides that Disability benefits will be reduced by the amount of Social Security benefits which you (and your spouse and family) are eligible to receive. The policy also provides that if you do not apply for Social Security benefits, the policy benefits may be reduced by the amount of Social Security benefits you and your spouse and family would be eligible to receive if application had been made on a timely basis.
>
> . . . . .
>
> We can estimate the amount of Social Security benefits you (and your spouse and family) will receive and reduce your monthly policy benefit by this amount. If Social Security benefits are estimated, benefits due will be recalculated when we receive proof of the amount awarded by Social Security or that Social Security benefits have been denied. If your Social Security application is denied following the final appeal process (at least through the hearing level), additional benefits will be refunded to you.

Plaintiff's Motion for Summary Judgment Appendix, Doc. No. 29 at 36."

information pamphlet[6] discussing Social Security benefits. Dahlin points out that the pertinent language of the "Disability Payment Options" form indicates that disability benefits paid by the employer will be reduced by benefits received from the Social Security Administration ("SSA") demonstrating, Dahlin argues, that there is an "assumption" contained in the language of this form that applicants who qualify for Social Security benefits will qualify for disability insurance and to deny LTD benefits when Social Security benefits have been awarded results in an inconsistent interpretation. In addition, Dahlin contends that the pertinent language of the pamphlet is evidence that if the SSA finds an applicant disabled, that means that the applicant is so impaired that the applicant "cannot perform any substantial gainful employment." Dahlin argues that this language contained in the pamphlet, provided by MetLife, demonstrates that MetLife's interpretation is inconsistent with the Plan. Dahlin urges that the language contained in these two documents is inconsistent with the Plan and this inconsistency demonstrates that the language contained in the Plan is meaningless and internally inconsistent.

However, the Eighth Circuit Court of Appeals has ruled that "provisions of a SPD prevail over conflicting provisions contained in the actual plan." *Tillery v. Hoffman Enclosures, Inc.*, 280 F.3d 1192, 1198 (8th Cir.2002). It is fair to say that the SPD provisions would also prevail over conflicting non-Plan documents. There-fore, these two non-Plan documents are neither persuasive nor do they establish "plan terms" or obligations. Regardless of what is contained in these two non-Plan documents, the SPD provisions would prevail. Based on the court's review, the court finds that MetLife's interpretation of the Plan does not render any language in the Plan meaningless or internally inconsistent.

### 5. Interpretation of the Plan is contrary to the clear language of the Plan

The final factor is whether MetLife's interpretation of the Plan contradicts the clear language of the Plan. *Ferrari*, 278 F.3d at 808. Dahlin argues that MetLife's interpretation of "disabled" is contrary to the clear language of the Plan because Dahlin is clearly disabled as demonstrated by the evidence. Again, there is a distinction between "interpreting" the language of the Plan and whether there is "substantial evidence" demonstrating that Dahlin is "disabled," *i.e.*, is or is not capable of performing the essential duties of her "regular occupation" on a full-time basis, which the court holds MetLife has reasonably interpreted to mean working as a production supervisor at another employer. With respect to the question of eligibility for LTD benefits, the SPD provides a two prong test, and, as previously discussed, MetLife considered the first prong and concluded Dahlin failed to meet its requirements because she was an individu-

---

6. The pamphlet, in pertinent part, states:
   Disability, as defined by the Social Security Administration, means that you are so impaired that you cannot perform any substantial gainful work. The disability must be expected to last at least 12 months or to result in earlier death.

   .     .     .     .     .

   Social Security denies many new claims, in fact, 2 out of 3 during the initial evaluation process. Those who are truly eligible, however, ultimately succeed.
   Plaintiff's Appendix, Doc. No. 34 at 171.

al who would be able to perform the essential duties of her regular occupation on a full-time basis at another employer. The court concludes that MetLife's interpretation of this provision is not unreasonable, nor is it contrary to the clear language of the Plan. *Jackson,* 303 F.3d at 887.

### D. Substantial Evidence

█ The issue before this court as to "substantial evidence" is whether Met-Life's decision to deny Dahlin's application for LTD benefits was "reasonable" or, put another way, "if a reasonable person could have reached a similar decision, given the evidence before him." *Jackson v. Metro.Life Ins. Co.,* 303 F.3d at 887.

### 1. Dahlin's contentions

Dahlin contends that Dr. Bacon was the only physician to submit a physician's statement, and because Dr. Bacon indicated "(1) Barb is not a suitable candidate for further medical rehabilitation services, (2) work hardening for Barb is not recommended, (3) returning to work part-time is not recommended for Barb, and (4) vocational counseling and/or retraining is not recommended for Barb," that she has demonstrated that she is "disabled."

### 2. Basis for MetLife's determination

MetLife acknowledges that before its plan administrator was such evidence as the May 12, 2000, telephonic interview during which Dahlin reported that she "can't be outside, anything with an odor bothers her, can't go anywhere" and that she no longer had hobbies of "flowering and gardening." Defendant's Appendix, Doc. No. 29 at 49. However, MetLife contends that also before the plan administrator was the June 19, 2000, therapist progress sheet from the cardiopulmonary rehabilitation department:

Just returned from trip to New York. Her biggest complaint was walking long distance ... She's improving significant-

ly ... relaxing her upper body more. Diaphragmatic breathing is also improving. We talked about asthma and reactive airway today. Barb maintains her environment very well ... filters in the home, wearing masks when working outside such as mowing.

Plaintiff's Appendix in Support of Resistance ("Plaintiff's Resistance Appendix"), Doc. No. 34 at 140. In addition, before the plan administrator was the labor market survey and nursing impressions. MetLife requested a review of the submitted information by an independent vocational counselor. Defendant's Appendix, Doc. No. 24 at 43. The record also contained a rehabilitation specialist's review of Dahlin's file which included the following conclusion:

It is probable that jobs exists [sic] where the *Production Supervisor* can perform the essential duties of those jobs without being exposed to the lengthy list of substances identified by Dr. Bacon. My search suggests that at least the four industries identified above would provide a good opportunity for *Production Supervisor* jobs within Ms. Dahlin's issued restrictions.

Defendant's Appendix, Doc. No. 24 at 46 (emphasis added). MetLife had the records reviewed by a disability specialist, who concluded, "Basically my impression is there is *no disability from her own occ[upation]* rather, it is an environmental issue. I do not feel claim is payable." Plaintiff's Resistance Appendix, Doc. No. 34 at 53–59 (emphasis added).

Other medical and vocational evidence before the plan administrator included the following statement from Dahlin's treating physician, Dr. Bacon, dated January 1, 2000:

She has done fairly well over the last couple of months but in part she has been away from work and away from some of the chemicals and dust and

things there that may have been [a]ffecting her breathing. She was also seen in Omaha as part of an evaluation for her legal claims and they did recommend that she try to limit her work exposures and she is now finally considering going on disability. She did feel so much better when she was away from work that she is going to try to do that.

Defendant's Appendix, Doc. No. 24 at 81. Dr. Bacon further stated on February 28, 2000, "She is continuing to have intermittent problems with her reactive airways disease. It is worse if she gets into some of the chemicals at work and occasionally when the humidity is high or the dust levels seem to be high. Overall though I think she is doing nicely. She has continued to use her inhalers and has done much better with the Flovent." Defendant's Appendix, Doc. No. 24 at 81.

The record shows MetLife reviewed the evidence, medical records and conducted a market survey before determining Dahlin was not "disabled." The record shows that the definition of "disabled" as provided by the SPD contains a two prong test but that the plan administrator was required to consider only the first prong because Dahlin was still in the elimination period because her 180 days of disability had not yet expired. The plan administrator determined that the evidence showed that during the elimination period, Dahlin could perform the essential duties of her regular occupation, *i.e.* work as a production supervisor, on a full-time basis—just in another environment. Defendant's Appendix, Doc. No. 24 at 2–4. Therefore, because Dahlin could work elsewhere as a production supervisor, in MetLife's opinion, Dahlin failed to meet the first prong of the test contained in the SPD and she was denied LTD benefits.

The court has reviewed the evidence and determines that it is "substantial" enough to support the reasonableness of MetLife's

determination that Dahlin's condition was such that she could "perform the essential duties of her regular occupation on a full-time basis with another employer." Defendant's Appendix, Doc. No. 24 at 15. Although, MetLife's decision to deny LTD benefits may not have been the only sensible interpretation, the decision provides a "reasoned explanation," "based on the evidence," for the particular outcome in this case. *Marshall,* 258 F.3d at 841.

### 3. Dahlin's contrary evidence

██ Dahlin contends that neither the quantity nor the quality of the evidence supports the plan administrator's decision. Dahlin asserts that because Dr. Bacon's opinion was not contradicted, it outweighs all other evidence in the record. However, in this court's view of the record, Dr. Bacon's opinion does not need to be contradicted. First, although Dr. Bacon's opinion supported the plan administrator's conclusion that Dahlin was not capable of working within the environment of AMI, it could reasonably have been viewed as barring Dahlin only from working in the environment at AMI. It was not conclusive to the determination that Dahlin could not work as a production supervisor in any other environment. Further, Dahlin does not generate a genuine issue of any material fact precluding summary judgment based on her contention that MetLife improperly discounted the opinions of her treating physician. The Eighth Circuit Court of Appeals has rejected the contention that the plan administrator should necessarily accord greater deference to the opinions of the claimant's treating physician. *Marshall,* 258 F.3d at 842. A treating physician's opinion will not automatically control, because the record must be evaluated as a whole. *Id.* Dr. Bacon agreed that Dahlin should apply for disability, as it pertained to her working as a production supervisor with AMI, but he

did not state that she was disabled to the point that she could not be employed elsewhere. In fact, he wrote that the airway irritants cause more of a problem than Dahlin's work load. Dr. Bacon never restricted her or advised against her traveling to Colorado, New York, or Spain. His records only indicate that particular exposures at AMI "might" be aggravating her condition and that her seeking disability from AMI was appropriate at that point in time.

Additionally, Dahlin argues that because MetLife never sent interviewers directly to any of the work locations identified in the labor market survey to determine, first hand, what irritants might be present at the identified locations listed in the labor market survey. However, MetLife did conduct a telephonic interview and questioned the potential employers as to what fumes or irritants might be present. As to Dahlin's contention that there was not substantial evidence in the record to support the plan administrator's decision, Dahlin has not met her burden to show that there is a genuine issue of any material fact for trial on the question of whether or not during the elimination period and for the next 24 months, she could "perform the essential duties of her regular occupation on a full-time basis because of Sickness or Injury," as required by the Plan. Defendant's Appendix, Doc. No. 24 at 7. A plan administrator's decision must be supported by "substantial evidence." *Donaho*, 74 F.3d at 899. The contrary evidence to which Dahlin points does not generate a genuine issue of any material fact that she was disabled within the terms of the Plan. The court concludes that, as a matter of law, MetLife's decision to deny LTD benefits was reasonable and was supported by substantial evidence and there is no genuine issue of any material fact. As a matter of law, there was no abuse of discretion by the plan administrator.

### 4. Social Security

■ Similarly unavailing is Dahlin's argument that the determination by the SSA, that she is entitled to Social Security Disability benefits, proves that MetLife's decision was unreasonable. Dahlin argues that she should be awarded LTD benefits because she was awarded Social Security benefits; that MetLife had knowledge she was applying for Social Security benefits; and that MetLife had provided her with a pamphlet that stated, "Those who are truly eligible [for Social Security] benefits, however, ultimately succeed." Plaintiff's Resistance Appendix, Doc. No. 34 at 171.

■ However, an ERISA plan administrator or fiduciary "generally is not bound by a SSA determination that a plan participant is 'disabled.'" *Jackson*, 303 F.3d at 889 (8th Cir.2002) (citing *Schatz v. Mut. of Omaha Ins. Co.*, 220 F.3d 944, 950 n. 9 (8th Cir.2000)). A case, such as this, which involves denial of LTD benefits, yet award of Social Security benefits, "appears to be the product of discretionary judgment applied to a record containing conflicting evidence as well as the result of the somewhat different standards governing social security and the ERISA determinations." *Schatz*, 220 F.3d at 949 n. 9 (citing *Conley v. Pitney Bowes*, 176 F.3d 1044, 1049–50 (8th Cir.1999) (holding that elaborate schemes mandated by the SSA in the context of evaluating a claimant's subjective complaints of pain and fitness for particular jobs need not be "import[ed] wholesale, into what is essentially a private-law area"), *cert. denied*, 528 U.S. 1136, 120 S.Ct. 979, 145 L.Ed.2d 930 (2000)).

Although, the SSA has a more restrictive definition of "disabled" than MetLife, it is the opinion of this court that, based upon the record before the plan administrator, MetLife, nevertheless, did not abuse its discretion in determining that Dahlin was not disabled. This court is

satisfied that based upon the record before the plan administrator—as to the extent Dahlin could perform the essential duties of her regular occupation on a full-time basis elsewhere—the plan administrator's decision was reasonable. *See Jackson*, 303 F.3d at 887 (stating that a "decision is reasonable if a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision").

## III. CONCLUSION

Having found that Dahlin has failed to generate a genuine issue of any material fact, the court finds that MetLife is entitled to summary judgment on Dahlin's claim under the ERISA. The denial of LTD benefits was not an abuse of discretion as a matter of law, because MetLife's interpretation of the Plan was not unreasonable and there was substantial evidence supporting MetLife's determination that Dahlin was not "disabled" within the meaning of the Plan.

THEREFORE,

1. The motion for summary judgment by plaintiff Barbara Dahlin is denied.

2. The defendant's request for oral argument is denied.

3. The motion for summary judgment by defendant MetLife is granted. Judgment shall enter accordingly.

4. The trial in this matter set to begin on April 21, 2003, is cancelled.

**IT IS SO ORDERED.**