# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 00-3441/3923

_____

| | | |
|---|---|---|
| Delta Family-Care Disability and Survivorship Plan, | * * * | |
| Appellant, | * * | Appeal from the United States District Court for the Eastern |
| v. | * * | District of Arkansas |
| Harold Marshall, | * * | |
| Appellee. | * | |

_____

Submitted: May 17, 2001

Filed: July 31, 2001

_____

Before BOWMAN and BEAM, Circuit Judges, and KYLE, District Judge.[1]

KYLE, District Judge.

Delta Family-Care Disability and Survivorship Plan ("the Plan") appeals from the final judgment entered by the district court in favor of Harold Marshall

_____

[1] The HONORABLE RICHARD H. KYLE, United States District Judge for the District of Minnesota, sitting by designation.

("Marshall"), directing the Plan to reinstate Marshall's long-term disability benefits pursuant to the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). The Plan argues that, while the district court identified the correct standard for reviewing the Plan's decision -- a deferential "abuse of discretion" standard -- the court misapplied that standard when it reviewed the administrative record and concluded that the Plan administrator's decision was not supported by substantial evidence.[2] The Plan also appealed from a subsequent order granting in part Marshall's request for attorney's fees. We reverse the district court's judgment reinstating Marshall's long-term disability benefits and vacate the Order awarding fees.

## I.    Background

### A.    Marshall's Injury and Treatment Therefor

From approximately 1979 to 1991, Marshall worked as a non-pilot employee for Delta Airlines, most recently as a senior customer service agent. In March 1989, he sustained a lower back injury at work.[3] Marshall continued to work at Delta, and pursued non-invasive treatment for his back, until September 1991. When Marshall's back problems persisted, orthopaedic surgeon Harold Chakales performed a laminectomy and fusion in November 1991. The fusion involved the spine from the L-4 vertebra in Marshall's lower back to the sacrum. By a letter dated January 2, 1992, Dr. Chakales advised Delta that recovery from such spinal

---

[2] The Plan further argues that the district court erred in denying the Plan's motion to compel discovery from Marshall concerning other disability benefits he had received during the period he was also receiving benefits from the Plan.

[3] Marshall sustained an earlier lower back injury in 1980 when he was struck in the back at work by a piece of falling equipment. To repair the injury suffered in that accident, Marshall underwent back surgery in 1980. Marshall made a good recovery from that surgery and returned to work at Delta.

fusion surgery takes anywhere from two to five years.

Following his surgery in 1991, Marshall remained under the care of Dr. Chakales, who periodically submitted statements to the Plan advising it of Marshall's status. In July 1994, Dr. Chakales performed a second back surgery to remove hardware associated with the spinal fusion. On January 4, 1995, Dr. Chakales assigned a 35% anatomical impairment to Marshall's body as a whole. On April 24, 1995, Dr. Chakales stated in his progress notes that Marshall's spinal surgery had reached maximum healing, and that he was discharging Marshall from his care -- Marshall could return to see Dr. Chakales on an "as needed" basis. Following his discharge, Marshall returned to Dr. Chakales every four to eight weeks to receive treatment for the pain in his lower back and legs. At the end of 1995, Dr. Chakales informed the Plan that Marshall was unable to work in his regular employment or in any other type of work.

In April 1993, while treating Marshall's spine injury, Dr. Chakales referred Marshall to a psychiatrist, Dr. Henry Good. Dr. Good treated Marshall with psychotherapy and drug therapy for depression associated with chronic pain syndrome. Sometime in 1994, Dr. Good retired, and Dr. Raymond Remmel took over Marshall's psychiatric care, continuing with drug therapy. On November 7, 1994, Dr. Remmel opined that Marshall was unable to work due to his chronic pain, traumatic injury, and "unremitting depression." On April 6, 1995, Dr. Remmel assessed Marshall as being disabled by "morbid depression." Throughout his treatment of Marshall, Dr. Remmel has reported that Marshall is disabled due to his depression.

In October 1997, Dr. Chakales reported that Marshall was suffering from post-laminectomy syndrome and chronic pain syndrome. Dr. Chakales noted that, from a chronic pain standpoint, while Marshall would never be pain-free, he was able to manage his pain with two to three "Tylenol 4" per day and doses of another

3

pain medication called Soma. Dr. Chakales stated that the combination seemed effective and was "basically a low maintenance dosage." On January 8, 1998, Dr. Chakales repeated his assessment that Marshall was unable to work in any job, adding that Marshall was "not able to be rehabilitated."

### B. Marshall's Claim for Long-term Disability Benefits.

The Plan is a non-contributory employee welfare benefit plan available to eligible non-pilot employees of Delta Airlines, Inc. – it provides both short-term and long-term disability benefits. An employee is eligible for long-term disability benefits under the Plan "provided he is disabled at that time as a result of demonstrable injury or disease (including mental or nervous disorders) which will continuously and totally prevent him from engaging in any occupation whatsoever for compensation or profit, including part-time work."

On March 5, 1992, after receiving the maximum amount of short-term benefits allowed under the Plan, Marshall signed a claim notice for long-term disability benefits. In support of his claim, Marshall submitted an "Attending Physician's Statement" from Dr. Chakales stating that Marshall was "totally disabled" both for his regular job and for any occupation. The Plan approved Marshall's claim for long-term disability benefits on March 18, 1992. The Plan paid long-term disability benefits to Marshall until March 31, 1998.

During the six years in which he received long-term disability benefits, Marshall underwent several Independent Medical Examinations ("IMEs") by orthopaedists and Independent Psychiatric Examinations ("IPEs") by psychiatrists, at the request of the Plan. Three examinations are pertinent to the pending appeal.[4]

_____

[4] Two other examinations occurred before Marshall underwent surgery in 1994 to remove the hardware implanted in connection with his spinal fusion. The

On April 3, 1996, orthopaedist William Blankenship performed an IME. Dr. Blankenship concluded that Marshall was at that time capable from a physical standpoint of performing "some type of work in the form of restricted or light duty, clerical, and part-time." Dr. Blankenship stated that the work should be sedentary in nature and should not require a lot of bending or stooping.

The following month, Marshall underwent an IPE by Stephen C. Buchanan, M.D., a psychiatrist. Dr. Buchanan stated that Marshall seemed to be totally disabled physically in that he was unable to sit or stand for any length of time, his concentration was impaired by the medications that he was taking, and his energy level and ability to relate to others were impacted by his depression. Dr. Buchanan opined that Marshall was "likely" to be chronically incapacitated, but also thought it was "possible" that Marshall could work some kind of job from his home involving the telephone, at which Marshal could set his own hours. Dr. Buchanan recommended that Marshall receive psychotherapy with a psychotherapist. On July 10, 1996, Dr. Buchanan submitted an addendum to his report stating that he had subsequently reviewed the report of Dr. Blankenship's IME and concluded that, whatever one might say about whether Marshall was disabled from an orthopaedic perspective, one could nevertheless say that Marshall was totally disabled due to his depression, chronic pain, and his need to take medications that impair his concentration.

One year later, Marshall underwent a second IPE, this time performed by Bradley Diner, M.D.,a psychiatrist.[5] After meeting with Marshall and evaluating his records, Dr. Diner concluded that Marshall's pain was not fully associated with

Plan did not base its decision to terminate Marshall's benefits on either of these examinations.

[5] The Plan sent Marshall to Dr. Diner because Dr. Buchanan was no longer practicing in the Little Rock area.

non-psychiatric medical or neurological findings. Dr. Diner also noted that Marshall's depression had been only superficially addressed because the psychiatric intervention has mainly focused on pain management. Dr. Diner also raised a concern about what he regarded as Marshall's "overuse" of pain medications and recommended a pain management program.[6] Dr. Diner concluded that there was nothing from a psychiatric standpoint to prevent Marshall from working; his depression was not severe enough to warrant any significant disability. Accordingly, Dr. Diner opined that Marshall was immediately capable of performing some type of work, particularly of a sedentary nature, that offered the freedom to take breaks as needed and set self-determined hours.

The Plan also required Marshall to submit to a Functional Capacity Evaluation with a physical therapist on March 12, 1998. Barbara Morris, M.S., performed an evaluation lasting several hours from which she concluded that, from a physical standpoint, Marshall was capable of performing some type of work in the sedentary category with lifting restrictions of 25 pounds.

### C. The Plan Terminates Marshall's Long Term Disability Benefits

---

[6] Approximately three months later, in October 1997, Marshall's own orthopaedist, Dr. Chakales, reported that Marshall was taking fewer doses of pain medications than Dr. Diner had reported. Furthermore, Dr. Chakales described the dosage of pain medications Marshall was taking as "basically a low maintenance dosage."

On January 8, 1998, Marshall's own psychiatrist, Dr. Remmel, responded to the pain medication issue raised in Dr. Diner's report. Dr. Remmel stated that he had ruled out any overuse or abuse by Marshall and indicated that he himself prescribed much of the pain medications Marshall took. Dr. Remmel concluded: "I would recommend that [Delta Air Lines] cease the constant harassment of this unfortunate gentleman who suffered a severe injury while in the service of [Delta] and now lives with unremitting pain."

On March 30, 1998, the Plan sent a letter to Marshall informing him that, based on Dr. Diner's IPE, the Functional Capacity Evaluation performed by the physical therapist, Dr. Blankenship's IME, and surveillance reports indicating that Marshall was seen walking without a cane and driving a car, Marshall no longer met the eligibility requirements for long-term disability benefits. The Plan was therefore terminating Marshall's benefits effective April 1, 1998. The letter also explained Marshall's appeal rights.

When the Plan terminates an employee's long-term disability benefits, the employee may appeal that decision administratively. That process has two levels. At the first level, a subcommittee (whose members are appointed by the Administrative Committee of the Plan) reviews the challenged decision.[7] If the subcommittee decides the appeal against the employee, the employee may appeal that decision to the Administrative Committee itself. At each level, the employee may submit any written evidence or arguments that he wishes to support his claim for benefits.

Marshall timely appealed the termination of his benefits to the subcommittee. In support of that appeal, Marshall submitted additional medical documentation from Drs. Chakales and Remmel. Dr. Remmel stated, in a report dated April 6, 1998, that he "cannot and will not release Mr. Marshall to return to work." Dr. Chakales described Marshall as suffering from "post lumbar laminectomy syndrome with chronic low grade spinal arachnoiditis with chronic nerve root irritation" and reported on April 24, 1998, that Marshall was still disabled and was a "poor rehabilitative candidate." Marshall also submitted to the Plan a vocational assessment report from Pinnacle Rehabilitation. The vocational assessment

_____

[7] The "Administrative Committee" is the administrator of the Plan, vested with "[t]he operation and administration of the Plan . . . the exclusive power to interpret it, and the responsibility for carrying out its provisions."

indicated that, based upon the medical evaluations of Drs. Chakales and Remmel, it was neither physically nor psychologically appropriate for Marshall to return to work.[8]

In response to Marshall's appeal, the Plan asked Marshall to undergo two further IMEs. On June 17, 1998, Marshall underwent an Independent Orthopaedic Evaluation by Tad Pruitt, M.D. Dr. Pruitt spent approximately one and a half hours examining Marshall and another two hours reviewing his medical records and preparing his report. Dr. Pruitt concluded that Marshall might, from a physical standpoint, be able to perform a sedentary clerk's job if he were able to ease into the job by starting with just a couple of hours at a time and if he were able to move around as needed. Dr. Pruitt stated, however, that he could not appropriately comment on Marshall's mental ability to perform the job and noted that Marshall's subjective issues -- his mental problems and chronic pain -- may continue to limit him. Dr. Pruitt also raised a concern about Marshall's dependence on chronic pain medicines.

Two days later, Marshall underwent an IME by neurological surgeon, Anthony Russell, M.D. Dr. Russell concurred in Dr. Pruitt's findings and stated his belief that Marshall was not totally disabled to the point that he could no longer engage in any gainful employment. Dr. Russell continued:

> I realize it is not proper to use specific illustrations in order to form an opinion, however, if we use someone who is severely injured, such as Christopher Reeves, a patient with a C1-C2 fracture, who is unable to walk or breath for himself, then obviously Mr. Marshall's injury falls

---

[8] On June 24, 1998, Marshall's counsel arranged for him to be evaluated by James Moore, M.D., a neurosurgeon, who concluded that Marshall was "severely compromised in any abilities to work" and was not "a candidate to return to the workforce."

somewhere short of that degree of disability.  On the other hand, Mr. Reeves has been able to resume employment.  The ability to work is typically more a function of motivation rather than actual ability to engage in certain activities.

Dr. Russell concluded that the main limiting factor for Marshall was his subjective pain.  The Plan submitted additional documents from Marshall's treating psychiatrist to Dr. Diner, the psychiatrist who had completed Marshall's 1997 IPE, for his review.  Dr. Diner concluded that Dr. Remmel's letter did not change the opinion he expressed in 1997.

Marshall was accepted as permanently and totally disabled by the Arkansas Worker's Compensation Commission on September 1, 1998, a fact known to the Plan.  On September 22, 1998, the subcommittee notified Marshall that it was affirming the Plan's initial decision to terminate Marshall's benefits "based on the evidence presented that [Marshall] is able to perform some type of work other than his customary occupation."  By a letter dated December 15, 1998, Marshall appealed this determination to the Administrative Committee. On February 22, 1999, the Administrative Committee notified Marshall that his appeal was denied because medical evidence showed that he was physically and psychologically capable of doing some work.

## D.    The District Court Action

On September 10, 1999, Marshall filed a one-count complaint under  § 1132(a) of ERISA seeking reinstatement of his long-term disability benefits. On June 2, 2000, the Plan filed a Motion for Summary Judgment and submitted to the Court the administrative record that was before the Plan when it made its decision to discontinue Marshall's benefits.   Marshall opposed the motion and, the Plan argues, relied in part on documents that had not been presented to the Plan during the administrative process and/or had not been produced by Marshall during discovery.

The district court determined that the abuse of discretion standard applied and reviewed the record before the Plan for "substantive evidence" in support of its decision. The district court first observed that "the evaluations by the <u>non-treating</u> physicians were in conflict." The district court then noted that the only consistent evidence before the Plan came from Marshall's treating physicians, who have maintained throughout the relevant time period that Marshall was totally disabled. The district court determined that it was not reasonable for the Plan to disregard this "overwhelming evidence" from the doctors most knowledgeable about Marshall's condition. The district court further reasoned that the evidence in the administrative record on which the Plan relied came from evaluators who were "isolated to a particular specialty" and, therefore, did not take into account all of Marshall's problems. The district court held that the Plan's decision to terminate Marshall's benefits was not supported by substantial evidence and directed the Plan to reinstate Marshall's long-term disability benefits. This appeal followed.

## II. Standard of Review

ERISA provides a plan beneficiary with the right to judicial review of a benefits determination. 29 U.S.C. § 1132(a)(1)(B). An ERISA plan administrator's decision to terminate benefits is reviewed under an abuse-of-discretion standard where the plan gives the administrator discretion to determine eligibility for benefits and to construe the terms of the plan. <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989). As discussed above, the district court applied the abuse-of-discretion standard. Marshall does not dispute that the Plan contains the discretionary language necessary to merit an abuse-of-discretion standard;[9] rather,

---

[9] The Administrative Committee is expressly granted "the discretionary authority to interpret and construe the Plan, and decide all questions of eligibility of any Eligible Family Member to participate in the Plan or to receive benefits under it, its interpretation and decision to be final and conclusive."

he argues that the circumstances in this case require a more rigorous standard of review.

A court will review a plan administrator's decision to deny benefits under a less deferential standard where the plan beneficiary presents "material, probative evidence demonstrating that (1) a palpable conflict of interest or serious procedural irregularity existed, which (2) caused a serious breach of the plan administrator's fiduciary duty to him." Woo v. Deluxe Corp., 144 F.3d 1157, 1160 (8th Cir. 1998). Marshall's primary contention is that there was a serious procedural irregularity in the Plan's handling of his claim because the Plan received information from and allegedly acted in concert with Delta's workers' compensation carrier for purposes of reducing or eliminating benefits payable to him. Marshall complains that the Plan received and used IMEs that he had undergone in connection with his pending workers' compensation proceeding. The record before the Plan contained notes from the workers' compensation adjuster, IMEs, and a surveillance report regarding Marshall's physical activities.[10]

We conclude that, on the facts of this case, there was no "serious procedural irregularity" in the Plan's consideration and use of information obtained in connection with Marshall's workers' compensation proceeding. Indeed, Marshall himself submitted reports and correspondence that his physicians had addressed to Wausau Insurance, apparently in connection with Marshall's workers' compensation claim. Marshall also forwarded to the Plan a copy of the report prepared by Dr. Russell (whom Marshall identifies in his handwritten letter as "the doctor Wausau sent me to be seen by.") As for the surveillance report, we note that there is nothing procedurally improper about the use of surveillance. See McGarrah v. Hartford Life Ins. Co., 234 F.3d 1026, 1028-29 (8th Cir. 2000). Accordingly,

---

[10] The report indicates that Marshall drove a car on several occasions during the course of the surveillance and was observed walking to the mailbox without the assistance of a cane.

we decline to depart from the abuse-of-discretion standard warranted by the language of the Plan.

## III.    Application of the Abuse-of-Discretion Standard

We review a district court's application of the abuse-of-discretion standard de novo.  Fletcher-Merrit v. NorAm Energy Corp., 250 F.3d 1174, 1179 (8th Cir. 2001). Under an abuse-of-discretion standard of review, a plan administrator's decision to deny or terminate benefits must stand if it is reasonable, that is, if it is supported by "substantial evidence."  Id.; Donaho v. FMC Corp., 74 F.3d 894, 899 n.9 & 900 (8th Cir.1996).  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. of New York v. N.L.R.B., 305 U.S. 197, 229 (1938).  So long as the plan administrator's "findings are reasonable, they may  not be displaced on review even if the court might have reached a different result had the matter been before it de novo."  Donaho, 74 F.3d at 900.  Ultimately,

> a trustee decision is reasonable if a reasonable person could have reached a similar decision, given the evidence before him, not that a reasonable person would have reached that decision.  Put another way, the committee's decision need not be the only sensible interpretation, so long as its decision offer[s] a reasoned explanation, based on the evidence, for a particular outcome.

Id. at 899 (emphasis in original)(internal quotation marks and citations omitted).

The Plan argues that the district court erred in holding that the decision to terminate Marshall's benefits was "unreasonable" because the district court (1) improperly determined the weight to be given to various medical reports; (2) incorrectly concluded that the Plan should have given deference to Marshall's treating physicians; and (3) incorrectly found that the Plan disregarded the opinions of Marshall's treating physicians.  The Plan further contends that the district court should have viewed the administrative record underlying the decision as a whole,

rather than focusing on isolated portions of various doctors' opinions.

We agree with the Plan that the district court incorrectly reasoned that the Plan should have accorded greater deference to the opinions of Marshall's treating physicians. As authority for this proposition, the district court relied solely on Donaho v. FMC Corp., 74 F.3d 894 (8th Cir. 1996). The administrative record in this case, however, is much different from the record before the plan administrator in Donaho. The only doctor who opined that Donaho was not disabled was a physician who had merely reviewed her medical records and had never examined her. We therefore stated in Donaho that "where the reviewing physician's conclusions are contradicted by an examining physician and two treating physicians, reliance on the reviewing physician's conclusions seems especially misplaced and constitutes an abuse of discretion." Donaho, 74 F.3d at 901 (emphasis added). As we recently observed, however, a treating physician's opinion does "not automatically control, since the record must be evaluated as a whole." Fletcher-Merrit, 250 F.3d at 1180 n.3 (citing Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995)).

Here, the Plan did not base its decision to terminate benefits on the report of any physician who had merely reviewed Marshall's medical records. All of the doctors who conducted Marshall's IMEs and IPEs examined him and included in their reports information regarding their observations of Marshall's then-present condition. The question of deference as between the conclusions of a treating physician and a physician who has merely reviewed medical records is not at issue here. On that issue, Donaho is not controlling.

"The unreasonableness of a plan administrator's decision can be determined by both the quantity and quality of the evidence supporting it." Donaho, 74 F.3d at 900. There is certainly a quantity of evidence in this extensive record both for and

13

against Marshall's claim to continuing long-term disability benefits.[11] Marshall's treating physicians, Dr. Buchanan (who performed an IPE in 1996) and Dr. Moore submitted reports stating that Marshall was totally disabled, either physically or psychologically. On the other hand, the 1996 IME of Dr. Blankenship, the 1997 IPE of Dr. Diner (supplemented in 1998 in response to materials submitted by Marshall's treating psychiatrist), the 1998 IME of Dr. Pruitt, the 1998 IME of Dr. Russell, the 1998 Functional Capacity Examination by the physical therapist, and the surveillance report of Marshall's observed capacity to engage in certain daily activities support the conclusion that Marshall was not totally disabled either physically or psychologically.

With respect to the quality of the evidence before the Plan, the district court (and Marshall's counsel at oral argument) focused on Dr. Russell's analogy between Marshall's situation and that of actor Christopher Reeves. Dr. Russell acknowledged in his report that such an analogy may be inappropriate. That analogy does not, however, clearly invalidate the observations Dr. Russell made during his examination of Marshall -- observations reported by Dr. Russell prior to the "Christopher Reeves" letter. To the extent Dr. Russell's comments may be considered an expression of bias, we also note that, in 1998, Marshall's treating psychiatrist clearly and passionately articulated his view that Marshall was being

_____

[11] Marshall argues that the Plan's decision to terminate Marshall's disability benefits was unreasonable in light of the Arkansas Workers' Compensation Commission's determination in September of 1998 that Marshall was permanently and totally disabled. We have observed, however, that a governmental award of disability benefits is not inherently inconsistent with a decision that an employee is not eligible for disability benefits under an ERISA plan. See e.g., Schatz v. Mutual of Omaha Ins. Co., 220 F.3d 944, 950 n.9 (8th Cir. 2000). Nor is a governmental award of disability benefits controlling on the question of whether the ERISA plan should provide disability benefits. Indeed, if it were, the actions of a governmental agency would effectively strip the plan administrator of his discretion granted by the language of the benefits plan.

"harassed" by Delta Air Lines and the Plan, going so far as to opine that Marshall should sue the Plan. The district court did not consider whether Dr. Remmel's comments were evidence of a lack of objectivity on his part.

Finally, all of the medical information available to the Plan, both the reports prepared by Marshall's own treating physicians and those prepared by the doctors who performed the IMEs and IPEs, came from specialists. Therefore, the district court's criticism of the Plan's reliance on the reports of evaluators who were "isolated to a particular specialty" is without merit – Marshall's treating physicians were an orthopaedic surgeon and a psychiatrist. Based on our review of the record, we cannot conclude, as the district court did, that the Plan "disregarded" the reports of Marshall's treating physicians. Indeed, the Plan's final decision letter clearly demonstrates that the Plan did consider those reports.

Where the record reflects conflicting medical opinions, the plan administrator does not abuse its discretion in finding the employee not to be disabled. Donaho, 74 F.3d at 901. We conclude that conflicting medical opinions were presented to the Plan, and that there was "substantial evidence" to support the Plan's decision to terminate Marshall's long-term disability benefits. The Plan's decision was reasonable and the district court should not have overturned it.

## IV. Conclusion

Having determined that the Plan's decision to terminate Marshall's long-term disability benefits was reasonable, we vacate the judgment of the district court and direct that judgment be entered in favor of the Plan. We further vacate the district court's award of attorneys' fees to Marshall.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT