Jess FORDYCE

v.

LIFE INSURANCE COMPANY OF NORTH AMERICA, d/b/a CIGNA Group Insurance; and Honeywell International, Inc.

No. 02CV3507JMRFLN.

United States District Court, D. Minnesota.

July 22, 2004.

Denise Yegge Tataryn, Mansfield Tanick & Cohen, Minneapolis, MN, for Plaintiff.

Brian L. Lindberg, Hinshaw & Culbertson, Robert R. Reinhart, Judith A. Williams–Killackey, Jennifer Anne Dellmuth, Dorsey & Whitney, Minneapolis, MN, Daniel K. Ryan, Hinshaw & Culbertson, Chicago, IL, Matthew E. Klein, for Defendants.

---

## ORDER

ROSENBAUM, Chief Judge.

Plaintiff is a former Honeywell International, Inc. ("Honeywell"), employee who was denied short-term ("STD") and long-term ("LTD") disability benefits under Honeywell's Employee Benefits Plan ("the Honeywell Plan"). Honeywell is the administrator of the STD and LTD plans which are processed by the insurer, co-defendant Life Insurance Company of North America ("LINA"). Plaintiff seeks disability benefits under the Honeywell Plan.

The parties agree the LTD Plan falls under the Employee Retirement Income Security Act ("ERISA"), and that the STD Plan does not.[1] Defendants claim the denial of benefits was proper and ask the Court to uphold its decision. Each side seeks summary judgment.

The Court grants plaintiff's motion for summary judgment, and finds defendants abused their discretion in denying his claim for benefits.

## I. *Background*

### 1. *Plaintiff's Job Duties*

In 1996, plaintiff was recruited to work in Honeywell's Technology Strategy Organization Group as its Senior Program Manager. The written job description provides that the Senior Program Manager is to "[l]ead major projects or programs that span multiple SBU's [ (Strategic Business Units) ], sites, countries." LINA Exhibit at 000066. Plaintiff was to implement and orchestrate the company's technological resources, which included participating in all-day meetings and traveling to various Honeywell sites. Honeywell characterized plaintiff's position as a "desk job." According to LINA, the position consisted of "management-level meetings and traveling to a variety of sites around the country." LINA Exhibit at 001152.

Plaintiff's performance reviews were outstanding. One reviewer called him "the best program manager and organization leader I have ever known," noting plaintiff's "wide breadth of technical knowledge," along with his "drive and ingenuity." Plaintiff Exhibit at 1425. *Id.*

### 2. *Plaintiff's Medical Condition*

The onset of plaintiff's back pain is unclear, but all parties agree that he first began experiencing pain in the fall of 2000. *See,* Honeywell's Memo. for S.J., pg. 3; Pl's. Memo. in Opp'n., pg. 4. On November 14, 2000, plaintiff saw Dr. Ann Brutlag, who diagnosed his condition as discogenic low back pain. LINA Exhibit at 000139. Dr. Brutlag's notes describe his condition, finding that "Mr. Fordyce clinically seems to have disc related back pain with flattening of his lumbar lordosis, palpable spasm,

---

1. The STD Plan is considered an exempt payroll practice pursuant to 29 C.F.R. § 2510.3–1(b)(2). Accordingly, plaintiff's state law claims are not preempted by ERISA. The Court exercises supplemental jurisdiction over the state law claims. *See Emmenegger v. Bull Moose Tube Co.,* 197 F.3d 929, 936 (8th Cir.1999).

decreased range of motion." *Id.* Her notes further indicate his discogenic pain "[was] most consistent with the difficulty he has with driving and sitting." *Id.* Dr. Brutlag prescribed medication and physical therapy to commence that same afternoon. The physical therapy continued until December 21, 2000.

Plaintiff's condition did not improve by February, 2001, at which time Dr. Brutlag recommended an MRI scan. LINA Exhibit at 000133. The MRI revealed a desiccated and collapsed disc at L5–S1 at the base of plaintiff's spine which provided no cushion for the vertebral column. LINA Exhibit at 000130. Dr. Brutlag diagnosed plaintiff's condition as "significant degenerative disk disease in his lumbar spine." *Id.* She advised him to attend a MedX strength training program in an attempt to increase his mobility. Plaintiff attended the training sessions from March 21 to April 19, 2001. LINA Exhibit at 000187–215.

Plaintiff's back pain continually increased, leading Dr. Brutlag to recommend that he reduce his work schedule to 2 to 3 hours a day beginning April 4, 2001. LINA Exhibit at 000127. On April 23, 2001, Dr. Brutlag told plaintiff to stop working altogether. LINA Exhibit at 000123. Her notes described plaintiff's condition as follows:

> He experiences increased pain as the day progresses, with pain being relieved by prone or supine positioning. He gradually became unable to perform his job. The effects of pain on his disability to concentrate, focus, and position for extended periods of times prevents him from being able to effectively perform his job at this time. Mr. Fordyce has

been cooperative with treatment and has been highly motivated to get well.

LINA Exhibit at 000245–46.

Dr. Todd Ginkel, a chiropractor, and the owner of the MedX program facility, conducted 4–week and 8–week evaluations of plaintiff's condition. The 4–week evaluation dated May 1, 2001, noted "greater strength improvement rather than pain reduction." Honeywell Exhibit at 100137. He further noted "[plaintiff] continue[d] to experience quite a bit of discomfort especially after standing or sitting for extended periods of time." *Id.* Dr. Ginkel's 8–week evaluation, dated May 22, 2001, discharged plaintiff from the MedX training program because the clinic "[had] little else to offer him." Honeywell Exhibit at 100150.

In the 8–week evaluation, Dr. Ginkel stated he "was unclear as to the origin of [plaintiff's] pain and his symptomatic lack of response to rehabilitation." *Id.* A follow-up evaluation noted:

> I would like to make it clear that it was not my impression that Mr. Fordyce's pain was of a non-organic nature. It was purely that I was unclear as to whether his pain was of a discogenic or soft tissue origin. At this point it would be my impression that it is of a discogenic origin given his lack of response to rehabilitation.

LINA Exhibit at 000227.[2]

Plaintiff was then referred to Dr. James Schwender, a spine surgeon, in June, 2001, who reviewed the MRI revealing disc dessication on the "T2 weighted sagittal images at the 5–1 segments." LINA Exhibit at 000161–62. An X-ray report from the examination showed a narrowing of the L5–S1 disc space. Dr. Schwender first considered surgical fusion at the 5–1 level, but determined that a fusion procedure

---

**2.** Since neither party addresses this statement in their briefs, it is unclear as to when this report became part of the administrative record.

could not be performed because of disc space collapse. According to Dr. Schwender, a diskogram at the L4–5 level revealed a "small posterior disk bulge and small probable posterior annular tear." *Id.* Dr. Schwender agreed with Dr. Brutlag's opinion that plaintiff was totally disabled. LINA Exhibit at 000248. Dr. Schwender arrived at this decision "based on [plaintiff's] clinical picture, physical examination, MRI, and discography . . . ." LINA Exhibit at 000248. In an August 20, 2001, statement, Dr. Schwender observed that "[plaintiff] remains in severe pain relating to the disc degeneration and near complete collapse at the L5–S1 segment. Typically, medications are not effective treatment of advanced disc collapse." *Id.*

Unable to find any improvement in plaintiff's condition, Dr. Brutlag referred him to the Fairview Pain Program. LINA Exhibit at 00071. Plaintiff began this program on September 7, 2001, which included counseling, bio-feedback, relaxation training, and hypnosis. A February 14, 2002, hypnosis session revealed plaintiff's inability to concentrate for more than 8 minutes. LINA Exhibit at 00583. The report further stated plaintiff's inability to concentrate stemmed from pain in his lower spine, "intense enough that he could focus on nothing else." *Id.*

In addition to attending the Fairview Pain Program, plaintiff was directed to join The Marsh, a health club facility for ongoing physical therapy. Plaintiff began therapy there by working with exercise physiologists and physical therapists for continued strengthening and mobility.

### 3. *The Honeywell Plans*

Honeywell's STD Plan pays totally disabled eligible employees 26 weeks of base pay. "Total disability" means:

an eligible employee is prevented by: (1) accidental bodily injury; (2) sickness; (3) mental illness; (4) substance abuse; or (5) pregnancy, from performing the essential functions of his own occupation or any job the employer offers him . . . .

Honeywell Exhibit at 100005. Honeywell's STD Plan benefits are paid from the company's general assets. *See* Honeywell Exhibit at 100021.

Honeywell's LTD policy says:

The Employee is considered Disabled if, solely because of Injury or Sickness, he or she is either:

1. Unable to perform all the material duties of his or her Regular Occupation or a Qualified Alternative; or

2. Unable to earn 80% or more of his Indexed Covered Earnings.

LINA Exhibit at 001277–98.

The LTD Plan's policy has a six month elimination period, during which time "an Employee must be continuously Disabled before the Disability Benefits are payable." LINA Exhibit at 001300. Honeywell serves as the Plan Administrator, and LINA, d/b/a CIGNA, as the Claims Administrator under both policies. *See* LINA Exhibit at 001334; Honeywell Exhibit at 100009 and 100015. Under the STD Plan there are three reviews on eligibility determinations; LINA conducts the first and second reviews, with a final review by Honeywell.

### 4. *Plaintiff's STD Application*

Plaintiff sought STD benefits commencing May 1, 2001. LINA Exhibit at 000022–23. On June 21, 2001, LINA denied his request for benefits by letter stating:

Your policy defines "Total Disability" as follows: "The inability to perform the essential duties of your job and/or any other job for which you are reasonably qualified due to an illness or injury, *based on objective medical evidence.*"

Your policy further states: "The medical evidence must support your claim for disability benefits."

Honeywell Exhibit at 100334 (emphasis added).[3]

The Court's review of the actual STD policy does not find any requirement of "objective medical evidence."[4] LINA's denial letter set forth this non-existent requirement, and went on to evaluate the medical evidence, particularly relying on Dr. Ginkel's 4–week and 8–week evaluation reports. According to LINA, "Dr. Ginkel's records document a long history of back pain and he has not provided us with any evidence as to why you could no longer perform your occupation." Honeywell Exhibit at 100101. LINA's letter pointed out functional improvements in plaintiff's lumbar extensors, and concluded there was "no evidence as to what changed in [plaintiff's] condition that prevented [him] from working as of May 1, 2001." *Id.*

LINA's denial letter references Dr. Brutlag's May 14, 2001, notes, but makes no mention of notes relating to his November 14, 2001, visit. *Id.* The denial letter alludes to an 8–year old skiing injury to plaintiff's back in which he sustained a T8 compression fracture. *Id.* Plaintiff denies the skiing injury caused his disability, claiming his present condition is unrelated.

Once denied, plaintiff disputed these findings with the Claims Administrator. He was told to submit his discograms for review by Dr. Constance Hanna, Honeywell's Medical Director. On July 18, 2001, plaintiff complied with this request and submitted his discogram, MRI, x-ray reports, and Dr. Brutlag and Dr. Schwender's notes. On July 23, 2001, Linda Strandlund of Honeywell's Human Resources Department told plaintiff that "continuation of your paid medical leave of absence has been denied effective July 30, 2001." Plaintiff claims Dr. Hanna arrived at her decision without the benefit of "the documentation requested." Pl's. Memo. for Summ. J., pg. 7.

On August 21, 2001, plaintiff was directed to attend an independent medical examination ("IME") with Dr. Mark Wheaton. Dr. Wheaton reviewed plaintiff's medical records and answered a detailed questionnaire provided by LINA. In answer to the question "What is preventing claimant from returning to work?", Dr. Wheaton stated plaintiff "[could] not return to work because his back pain prohibits him from maintaining a sitting or standing posture for any length of time required to focus on these activities and complete a job task." LINA Exhibit at 000309, Honeywell Exhibit at 100074. Dr. Wheaton described the results of plaintiff's treatment to that point by stating:

[plaintiff] has not responded to a sound, conservative care approach, other than an increase in spinal strength, as noted on the MedX results. Sitting and standing tolerances have not increased. It does not seem likely that further physical therapy or exercise programs will change the course of the problem, although it is important to maintain

---

3. Honeywell did pay plaintiff STD benefits for three months despite its denial, but ceased making the payments once the error was discovered. LINA Exhibit at 000525. Although Honeywell does not waive its right to recoup its over-payment to plaintiff, it seeks no payment from him at this time. *See* Honeywell's Memo. at pg. 4.

4. *See* Plaintiff Exhibit at 1212–26. (Pursuant to Section 2.1(w) of STD Plan, " 'Total Disability' means that an Eligible Employee is prevented by reason of accidental bodily injury; sickness; mental illness; substance abuse; or pregnancy from performing the essential functions of his own occupation or any other job the Employer offers him … for which he is reasonably qualified by reason of education, training, or experience").

strength and flexibility to prevent further disability.

Honeywell Exhibit at 100074–75.

In response to the question "What are claimant's functional and/or physical capabilities?", Dr. Wheaton stated:

claimant's functional and physical capabilities currently would allow him to perform light duty activities, with the ability to move from static positioning of standing and sitting, while avoiding consequential lifting of greater than 15 pounds.

LINA Exhibit at 000309, Honeywell Exhibit at 100074.

In reply to an inquiry concerning plaintiff's ability to perform the activities of daily living, Dr. Wheaton responded:

claimant is able to perform most activities of daily living, provided he is flexible to take frequent breaks to change position, and if he is not required to lift, twist or bend frequently throughout the day.

*Id.*

Dr. Wheaton described his "objective findings that support the diagnosis" by saying:

My examination did not point to a radicular process, i.e., a herniation of a disc with pressure on the nerve root, but the claimants lumbar range of motion was limited and he had secondary muscle spasm about the paravertebral muscles of the lumbar spine.

LINA Exhibit at 000309, Honeywell Exhibit at 100073.

Dr. Wheaton made clear "he was unable to locate a motivation component which may be interfering with [plaintiff's] ability to return to full-time employment at his usual position." Honeywell Exhibit at 100075. Dr. Wheaton further stated:

[plaintiff] appear[ed] to be under a great amount of stress and depression due to his pain syndrome and ability to work at the level for which he is accustomed. This is causing secondary depression, which in turn may play a role in his inability to concentrate and focus on the job.

*Id.*

Finally, Dr. Wheaton opined that plaintiff's "symptoms are related to the onset of a work-injury in October, 200[0]."[5] Honeywell Exhibit at 100074.

LINA asked Dr. Wheaton to clarify certain responses in the questionnaire. He did so by letter dated September 17, 2001, explaining his view of the origin of plaintiff's injury, and that "without records indicating injury or treatment prior to October 1, 2000, it is logical to put the contributing injury to October 2000." LINA Exhibit at 000242. Dr. Wheaton characterized plaintiff's injury as "an overuse/repetitive trauma work-related injury." *Id.* LINA asked for clarification of a "discrepancy" in Dr. Wheaton's previous responses to questions "# 7 & # 8, with # 11."[6] LINA Exhibit at 000242. Dr. Wheaton responded by saying "claimant is capable of working any job requiring light duty activities within the parameters outlined." *Id.*

Plaintiff's counsel appealed the denial on September 25, 2001. The appeal letter included 22 exhibits, additional medical records, job descriptions, and statements from plaintiff and his wife. LINA Exhibit at 0000022–291; Plaintiff Exhibit at 1229.

---

5. Dr. Wheaton later noted the error in recording the year of origin as 2000, not 2001.

6. The first two questions relate to plaintiff's functional and/or physical capabilities and his ability to perform activities of daily living; # 11 was Dr. Wheaton's statement concerning plaintiff's inability to return to his job at Honeywell.

In addition to seeking the opinion of an independent medical examiner, LINA surreptitiously conducted surveillance on plaintiff's activity over six days in August, September, and October, 2001, with the approval of Honeywell's Medical Director. LINA Exhibit at 000317–18. The surveillance merely showed plaintiff at a restaurant, traveling to medical appointments, and traveling to The Marsh for physical therapy. LINA Exhibit at 000317–18. Although the investigators did not enter the facility, they did note plaintiff was there for two hours. They also observed plaintiff walking on roads near his residence, bending over to place his children in the car on one or two occasions, and driving short distances. *Id.* LINA's Senior Case Manager, Kim Stanley, wrote a letter to Dr. Daniel A. Nackley, an in-house physician advisor, advising him that the surveillance as "was not very informative." LINA Exhibit at 000345.

Ms. Stanley expressed some "concerns about the claim" to Dr. Hanna several times during the appeal by e-mail stating: "I really feel we should reopen this claim, our own IME stated he could do his job. Do you have any concerns, etc. about doing this? ? ?" LINA Exhibit at 000343. *Id.* Dr. Hanna replied:

> Do not reopen. The IME actually stated on requisitioning that he could work with restrictions and since he has a sedentary job we could have been [able] to accommodate. I believe you also have a surveillance tape that [demonstrated] he was able to walk several miles around a lake. Maybe we need a conference call with location people etc. to discuss before we do anything. The man has been laid off!

*Id.*

Thereafter, Ms. Stanley wrote to Dr. Nackley requesting a review of plaintiff's claim and a "physician's opinion on his functionality." LINA Exhibit at 000345.

Dr. Nackley reviewed plaintiff's file on December 10, 2001, and stated that, "while he may be experiencing back discomfort, there are no anatomical findings which indicate pathology which would be expected to cause this degree of impairment." LINA Exhibit at 000351. Dr. Nackley noted plaintiff's ability "to move and walk without any type of ambulatory assistive device," and his "[ability] to bend." *Id.* He concluded that "the medical on file does not indicate an impairment such that functionality would be affected with regard to his regular sedentary job." *Id.* He observes that, while plaintiff "may have discomfort from time to time; ... his strengths are far in excess of what would be expected based on the documentation which has been presented." *Id.*

On January 3, 2001, LINA issued its denial letter to plaintiff's appeal for short-term disability benefits. LINA Exhibit at 000647–50. The denial stated that "although [plaintiff] may have back pain and need to frequently change positions, Honeywell has indicated that his current occupation has allowed for him to frequently change positions and they would accommodate any restrictions placed on him by his physicians." LINA Exhibit at 000649. LINA relied on Dr. Nackley's opinion that the "medical evidence was not supportive of [plaintiff's] inability to perform his occupation as a Program Manager, which is sedentary." LINA Exhibit at 000649–50.

Plaintiff's second appeal was filed on March 13, 2002. Honeywell Exhibit at 100026–29. The second appeal contained "updated medical records, Fairview Pain Program Records, plaintiff's clarifications of pain program records, and a statement from a co-participant in the Fairview Pain Program." Pl's Memo. for S. J., pg. 11; *see also,* LINA Exhibit at 000292–410. The appeal was reviewed by Dr. Hanna

who recommended affirming the denial of benefits. *See* Hanna Aff., 8. Honeywell, as the Plan Administrator, adopted this recommendation. *See,* Honeywell Exhibit at 100026. Honeywell also relied on a report from Dr. S. Proudfoot of Fairview's Pain Management Center, which concluded that plaintiff had "above normal strength." Dr. Proudfoot also noted that plaintiff appeared "quite fixated on disability," and that he refused to see a psychiatrist on the advice of his lawyers. Honeywell Exhibit at 100027. Honeywell's denial letter contained footnotes stating: "it is significant . . . that your increasing reports of back pain and inability to work coincide with the receipt of your notice of severance . . . ." *Id.*

Brian Marcotte, Honeywell's Vice President of Benefits and Compensation, signed the denial letter. Its "Decision" section summarizes his findings, and outlines the basis for denial as:

> Under the Plan, total disability is defined as being unable to perform the essential functions of your occupation or any other job Honeywell offers you for which you are reasonably qualified by reason of education, training, or experience, *based on objective medical evidence.*" (emphasis added).

Honeywell Exhibit at 100028–29.

The Plan's definition of "total disability" set forth at Section 2.1(w), however, does not require a claimant to establish disability by objective medical evidence. *See* Plaintiff's Exhibit at 1212–26.

According to Honeywell, plaintiff was offered a position within Dr. Wheaton's restrictions effective September 17, 2001. Honeywell Exhibit at 100118, 164. Plaintiff denies this assertion, claiming Honeywell's only offer of accommodation occurred in July, 2001. Honeywell Exhibit at 100107–109, 115, 262. The medical notes of Kate Watters, a Honeywell Medical Department nurse, documented an offer of a sit/stand work station, and "ice packs [for plaintiff's] back while lying down in [a] cot in [the] nurses office as often as needed." Honeywell Exhibit at 100115. *Id.* The record reveals only two other offers to accommodate plaintiff's condition contained in a July 23, 2001, letter from Linda Strandlund, and in an "Authorization to Return to Work" document. Neither document offers concrete accommodations. The Strandlund letter, which preceded plaintiff's IME report states "reasonable accommodations can be made for your work station." Honeywell Exhibit at 100262. The "Authorization to Return to Work"—the only communication after the IME—merely reiterates the medical restrictions for performing light duty activities. Honeywell Exhibit at 100118.

While plaintiff's disability application was being processed, Honeywell eliminated plaintiff's department as part of a reduction in force ("RIF") plan. Honeywell Exhibit at 100330. Honeywell's disability policy, however, did not permit RIF layoffs for employees receiving disability benefits, unless the employee was authorized to return to work. Honeywell Exhibit at 100050. Plaintiff was authorized to return to work, and was laid off after he declined to do so.

### 5. *Plaintiff's LTD Application*

Plaintiff first sought a copy of the LTD Plan on April 3, 2001. Plaintiff's Exhibit at 1289, 1298. He made at least 13 subsequent requests on April 17 and 20, May 2, 7, 16, and 24, June 14, August 2, 13, 14, 21, and 23, and September 25, 2001. Within two weeks of his April 17, 2001, request, plaintiff received a copy of the LTD Summary Plan description, but not the LTD Plan. Honeywell claims it could not provide plaintiff with the actual LTD Plan, because none existed at the time as a

result of a dispute with LINA. *See* Aff. Kevin Covert. Honeywell and LINA resolved their dispute in 2002 and negotiated a policy to cover the LTD Plan prior to June 1, 2002. *Id.* The LTD Plan contract was finalized by the spring of 2002, and a copy was sent to plaintiff on May 31, 2002. Plaintiff's Exhibit at 1242.

Plaintiff applied for LTD benefits on July 1, 2002. LINA 001247–1259. On July 8, 2002, LINA requested that plaintiff complete a disability questionnaire, execute a reimbursement agreement, submit a copy of his Minnesota driver's license, and submit proof of application for social security benefits. LINA 000018. Two days thereafter, LINA issued a letter denying plaintiff's LTD claims stating "[plaintiff's] [inability] to provide sufficient evidence of his total and continuous disability during the Elimination Period of May 1, 2001 through November 1, 2001" renders him ineligible for LTD benefits. LINA Exhibit at 001227.

Plaintiff appealed the denial by letter dated July 25, 2002. LINA 000015–20. Plaintiff claims he submitted continuing disability documentation from his treating physician and the completed disability questionnaire on July 8, 2002. Pl's Memo. for S.J. pg. 14; LINA Exhibit at 000015–20. LINA informed plaintiff by letter dated August 13, 2002, that his appeal had been received, but failed to note the date of receipt. LINA Exhibit at 000482.

Plaintiff filed suit on August 27, 2002, seeking STD benefits. His complaint was amended on September 13, 2002, to include a claim for LTD benefits. To date, LINA has not responded to plaintiff's July 25, 2002, appeal letter.[7]

This Court has jurisdiction over the LTD benefits claims pursuant to 28 U.S.C. § 1331, and exercises supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## II. *Analysis*

Summary judgment is appropriate when there are no material facts in dispute, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party opposing summary judgment may not rest upon the allegations set forth in its pleadings, but must produce significant probative evidence demonstrating a genuine issue for trial. *See Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505; *see also Hartnagel v. Norman*, 953 F.2d 394, 395–96 (8th Cir.1992). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. If the opposing party fails to carry that burden, or fails to establish the existence of an essential element of its case on which that party will bear the burden of proof at trial, summary judgment should be granted. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### 1. *Standard of Review*

When reviewing an ERISA case, a Court must determine the applicable standard of review. The parties variously refer to three potential standards of review: abuse of discretion, de novo review, or a sliding scale less deferential standard.

---

**7.** ERISA requires an appeal response within 45 days of receipt. It is unclear when the appeal was received in this case, because the August 13 letter makes no mention of this; it only notes, "we are in receipt of your letter dated July 25, 2002 ...." LINA 000482.

The parties agree that, since the STD Plan is not governed by ERISA, Minnesota contract law governs the resolution of this claim. *See* 29 C.F.R. § 2510.3–1(b)(2).[8] The Court proceeds under this assumption because the result remains the same under either framework.[9] The parties do, however, disagree as to what standard of review controls. Plaintiff, without citation to any authority, asserts that de novo review is warranted, because "plaintiff's claim for STD benefits is based on a state contract law claim." Pl's. Summ. J. Memo. at 15. Defendants oppose this position and claim that an abuse of discretion standard governs. A finding on this issue is not necessary for purposes here, because defendants' denial of STD benefits was improper under any standard.

■ It is undisputed that the LTD Plan is a qualifying ERISA plan. Accordingly, the standard of review turns on the Plan's language. The standard of review is presumed to be de novo, "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). When the plan vests its administrator with discretion, the court's review is limited to determining whether the administrator abused that discretion. *Id.*[10] The Honeywell Plan grants discretion to the Plan Administrator. The Court, therefore, affords the Plan Administrator the most deferential form of review. But even so, the Court finds defendants have abused their discretion in denying plaintiff's LTD benefits.

## 2. STD Claim

When applying the abuse of discretion standard, a reviewing court must consider whether a "'reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision.'" *Ferrari v. Teachers Ins. & Annuity Ass'n*, 278 F.3d 801, 807 (8th Cir.2002) (quoting *Cash v. Wal–Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir.1997) (emphasis in original)). In considering reasonableness, a court considers the evidence "actually before the plan administrator." *See Smith v. Unum Life Ins. Co. of Am.*, 305 F.3d 789, 794 (8th Cir.2002). While a preponderance of evidence is not required, there must be "more than a scintilla" of evidence supporting the administrator's decision. *Woo*, 144 F.3d at 1162. A court must also consider "both the quantity and quality of evidence." *Delta Family-Care Disability and Survivorship Plan v. Marshall*, 258 F.3d 834, 842 (8th Cir. 2001).

■ Here, the Court finds defendants abused their discretion by improperly elevating the level of proof required to establish a disability, misrepresenting the findings in the surveillance reports, taking Dr. Wheaton's and Dr. Ginkel's statements out

---

8. The STD Plan explicitly provides that it is governed by Delaware law, but the parties agree Minnesota law applies to the alleged breach of the STD contract. *See* Honeywell's Response at 4. Whether to apply Minnesota or Delaware law is a trivial point, as there is no material distinction between the law of either state on a matter of contract interpretation.

9. The Court is also mindful of the STD Plan's language granting discretion to the Plan Administrator to determine eligibility and con-

strue the plan documents. However, the Court need not decide if a non-ERISA plan granting a plan administrator the discretion to determine eligibility and construe the terms of a plan is to be afforded the same level of deference as if it were an ERISA plan.

10. The Eighth Circuit Court of Appeals has found the abuse of discretion and arbitrary and capricious standards to be interchangeable in ERISA cases. *Sahulka v. Lucent Tech.*, 206 F.3d 763, 766 (8th Cir.2000).

of context, and failing to conduct a full and fair review of the applications.

Defendants based their decision to deny STD benefits on a purported lack of objective medical evidence. The STD Plan defines "total disability" to "[mean] that an eligible employee is prevented by: (1) accidental bodily injury; (2) sickness; (3) mental illness; (4) substance abuse; or (5) pregnancy, from performing the essential functions of his own occupation or any job the employer offers him . . . ." Honeywell Exhibit at 100005. Defendants seek to inject a requirement that an STD Plan claimant demonstrate a disability "based upon . . . objective medical evidence." Honeywell Exhibit at 100334. There is no contractual support for this heightened requirement of proof. The term "objective medical evidence" is not part of the STD Plan.[11] Plaintiff's Exhibit at 1212–26.

Honeywell's denial of STD benefits is unquestionably based on a purported failure of proof of plaintiff's disability. The June 21, 2001, denial letter notes "there is no evidence as to what changed in your condition that prevented you from working as of May 01, 2001." Honeywell Exhibit at 100101. Honeywell's subsequent May 28, 2002, denial letter says, "there is simply insufficient objective evidence to support your claim." Honeywell Exhibit at 100029. LINA's January 3, 2002, denial letter cites Honeywell's in-house physician who said "that the medical evidence was not supportive of [plaintiff's] inability to perform his occupation." LINA 000649. The Court finds defendants' post hoc expansion of the Plan definition of disability to have raised the level of proof beyond that called for by the plain language of the Plan. Plaintiff's Exhibit at 1212–26. "To allow such an untimely redrafting of the Plan would be to allow [the defendants] to gain an unbargained-for benefit so as to 'defeat the legitimate expectations of the [Plan] participants.' " *Pralutsky*, at 850 (quoting *Mitchell v. Eastman Kodak, Co.*, 113 F.3d 433, 443 (3rd Cir.1997)).

On these facts, the Court's decision would be the same even if the Plan had required objective medical evidence. Plaintiff's MRI examination reveals "disc dessication at the L5–S1 segments with advanced disc height collapse" and "noncordant pain at the L4–5 level suggesting a correlation with a posterior annular tear." *Id.* Every examining physician agreed with these findings. Plaintiff's condition was so severe that Dr. Schwender was unable to perform a discogram at the L5–S1 level because of "advanced collapse." The x-ray requested by Dr. Brutlag disclosed "a narrowing of the L5–S1 disc space." All physicians who examined plaintiff discerned "palpable spasms" in his lower back.

This objective evidence was corroborated by a host of other factors. Plaintiff took the maximum dosage of Ibuprofen (2400 mg) daily (after narcotic Vicodin proved ineffective); he experienced difficulty in doing household work, yard work, recreational activities, driving for extended periods of time, and could not remain seated for long periods, rendering him unable to fly. He had difficulty sleeping, and was given Trazadone to help him sleep. His condition reached a point where, on August 13, 2001, he could not sit for more

---

11. The document entitled "Short Term Disability Information Package" does say that "Any disability or a physician's opinion that an employee is disabled from work must be supported by objective clinical findings and specifically supported by medical documentation." Honeywell Exhibit at 100048. But this statement does not support the defendants' position, because the brochure is explicit: "if there is a difference between this document and the plan document, the plan document will be the governing document." Honeywell Exhibit at 100040. Here there is a difference; the plan document contains no "objective clinical findings" language.

than 2 to 3 minutes at a time during a visit with Dr. Brutlag.

Defendants apparently dismissed plaintiff's subjective complaints of pain based on their view that his symptoms were not supported by objective evidence. Honeywell Exhibits at 100334 and 100026–29; LINA Exhibit at 000647–50. No fewer than three physicians concluded plaintiff could not return to work. Dr. Brutlag concluded plaintiff could only sit, stand, or walk for a "1/4 hour at a time, with a total of 2 hours a day of sitting, standing, and walking." She noted "MRI of lumbar spine demonstrates advanced degenerative disk change at L5–S1 which is consistent with his clinical examination and his symptom complaints." According to Dr. Schwender, "[plaintiff] remains in severe pain relating to the disc degeneration and near complete collapse at the L5–S1 segment. Medications are not effective treatment of advanced disc collapse. He will most likely benefit from surgery intervention, and he will likely remain disabled until surgery has been performed." Even defendants' independent medical examiner recognized that "claimant cannot return to work because his back pain prohibits him from maintaining a sitting or standing posture for any length of time required to focus on these activities and complete a job task." Honeywell Exhibit at 100074.

Defendants cling to a single statement in a supplemental report produced by Dr. Wheaton at their request. From this statement defendants claim plaintiff is able to return to his job. In fact, Dr. Wheaton clarified that plaintiff may perform "any job requiring light duty activities within the parameters ... outlined." Defendants seized on this statement, even when there is no indication he had departed from his original opinion that plaintiff "[could] not return to work because his back pain prohibits him from maintaining a sitting or standing posture for any length of time

required to focus on these activities and complete a job task." His supplemental statement does not, in any way, recant his original opinion, but merely states plaintiff could perform a light duty job; not that plaintiff's position as a Senior Program Manager was such a job. Plaintiff's position required travel and meetings, and an ability to concentrate and focus on job tasks. The Court finds defendants' undue reliance on Dr. Wheaton's "clarification" to be unreasonable and an abuse of discretion. *See McDonald v. Western–Southern Life Ins. Co.*, 347 F.3d 161, 171 (6th Cir. 2003) (discounting supplemental report of IME as insufficient, when opinion was changed, without any justification for the change, other than telephone contact from plan administrator).

Defendants did not obtain a vocational assessment, and lack thereof may not be unreasonable per se. But Honeywell's recommendation to plaintiff to lay down and ice his back in the nurse's office was untenable, and does not appear to address plaintiff's inability to sit through long meetings, his inability to focus due to the excruciating pain, and his inability to travel by air or auto to attend meetings.

The Court observes that Honeywell's proposal fails to account for several critical aspects of plaintiff's job duties by ignoring Dr. Brutlag's conclusion that plaintiff could only sit, stand, or walk for a 1/4 hour at a time, with a total of 2 hours a day of sitting, standing, and walking. LINA Exhibit at 000146–49. While a defendant is not required to afford special weight to a treating physician's opinion, Honeywell's decision to simply ignore every examining physician's opinion is puzzling. Such a decision to "ignore, isolate, and narrowly interpret the medical findings favorable to [plaintiff]" is unreasonable. *Williamson v. A.T. Massey Coal Co., Inc.*, 56 F.Supp.2d 656, 660 (S.D.W.Va.1998).

Only Dr. Nackley, LINA's in-house physician, has offered an opinion which ostensibly supports Honeywell's proposal. He, of course, did not examine plaintiff, but relied instead on the medical file. While Dr. Nackley appears to acknowledge that "plaintiff's symptomatic complaints are numerous . . . ," he claims he found nothing in plaintiff's "medical file [that would] indicate an impairment that would be expected to affect his functionality with regard to his regular duties." LINA Exhibit at 000351. Dr. Nackley appears to have simply disbelieved plaintiff's complaints of pain. He notes that "while he may be experiencing discomfort, there are no anatomical findings on the studies which indicate pathology which would be expected to cause this degree of impairment." *Id.*

Defendants have chosen to credit a non-examining, in-house physician, rather than relying on three examining physicians who rendered consistent opinions finding plaintiff could not return to work. The Court finds this decision to be unreasonable and falls far below the "substantial evidence" which might justify denial of plaintiff's claim. *See Morgan v. UNUM Life Ins. Co. of America,* 346 F.3d 1173, 1178 (8th Cir.2003) (affirming district court's decision that plan acted arbitrarily and capriciously in denying plaintiff's disability claim by crediting in-house expert who had no expertise in area of medicine over contrary opinions of two primary treating physicians).

LINA's initial denial, relying on Dr. Todd Ginkel's reports, is even more troubling. LINA focused on Dr. Ginkel's bare observation that plaintiff had shown increased strength, and his statement that he could not diagnose the precise etiology of plaintiff's condition. LINA cited the strength increase while ignoring the remainder of the sentence, which said plaintiff "states there has been greater strength improvement rather than pain reduction."

Honeywell Exhibit at 100137. Plaintiff never had strength problems—he was incapacitated by pain.

Although Dr. Ginkel's letter mentions Dr. Brutlag's, he appears to ignore her observation that plaintiff has "degenerative disc disease at the L5–S1 level, [with] marked loss of mobility, and spasm in his lumbar spine." Dr. Ginkel later clarified his position noting:

> . . . it was not my impression that Mr. Fordyce's pain was of a non-organic nature. It was purely that I was unclear as to whether his pain was discogenic or soft issue origin. At this point it would be my opinion that it is of discogenic origin given his lack of response to rehabilitation.

The Eighth Circuit Court of Appeals has previously criticized a denial of benefits under ERISA while focusing on equivocal physician statements and failing to "address the extensive medical evidence relating to [claimant's] disability." *See Norris v. Citibank, N.A. Disability Plan (501),* 308 F.3d 880, 885 (8th Cir.2002) (criticizing plan's focus on equivocal statements of physician, and failure to "address the extensive medical evidence relating to [claimant's] disability").

Honeywell's conclusions based on the surveillance borders on the foolish. Even Kim Stanley, one of LINA's own case managers, characterized the surveillance as "not very informative." There is no smoking gun showing plaintiff engaged in heavy lifting or strenuous activity. The surveillance merely shows plaintiff walking near his residence, moving into and out of an automobile, going to a health club for physical therapy, and walking near a lake for twenty minutes. It "reveal[s] nothing new and was not substantial evidence supporting [defendants'] decision to discontinue [his] benefits." *Morgan,* 346 F.3d at 1178 (holding that plan administrator's

"surveillance showing claimant driving his car, eating lunch at a restaurant, carrying light objects, sitting and reading, and stretching and doing light aerobic exercise at the gym for about forty-five minutes ... was not substantial evidence").[12]

■ Honeywell's surveillance reveals nothing showing plaintiff's ability to travel cross-country, sit at meetings for extended periods of time, or maintaining attention over long periods of time while experiencing severe discomfort.[13] A plan administrator may be permitted to make credibility determinations, but they cannot simply dismiss subjective complaints of pain without justification. *See Collins v. Continental Casualty Co.*, 87 Fed.Appx. 605, 607 (8th Cir.2004) (unpublished) (per curiam) (plan administrator may not deny benefits simply because the only evidence of a disabling condition is subjective evidence) (citing *Krizek v. Cigna Group Ins.*, 345 F.3d 91, 99, 101–02 (2d Cir.2003); *Connors v. Connecticut Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2nd Cir.2001)). Absent any evidence casting doubt on plaintiff's claims of pain, defendants' denial of his claim for lack of objective evidence was unreasonable, and consequently, an abuse of discretion.

### 3. Plaintiff's LTD Application

■ LINA did not conduct a full and fair review of plaintiff's LTD application. This is an abuse of discretion.[14] LINA's stated reason for denial of LTD benefits is failure to satisfy the six-month elimination period. Its letter relies entirely on the review conducted in the STD benefits process. As stated above, the Court found defendants abused their discretion in denying STD benefits. The Court reaches the same conclusion regarding LINA's denial of his LTD claim because LINA's denial of LTD benefits was premised on the flawed STD appeals process.

### 4. Plaintiff's State Law Claim for Failure to Pay Wages

Beyond his state law breach of contract claim, plaintiff alleges violation of Minn. Stat. § 181.14. This claim fails, however, because the statute applies only to employees who voluntarily quit or resign. *See Id.* Plaintiff does not specify whether he quit, resigned, or was terminated.

■ If he claims he was terminated, it appears Minn.Stat. § 181.13, rather than § 181.14, applies. *See* Minn.Stat. § 181.13 (providing a cause of action to a dis-

12. Defendants heavily rely on *McGarrah v. Hartford Life Ins. Co.* in support of its position. 234 F.3d 1026 (8th Cir.2000). *McGarrah* is, however, factually distinct from the instant case. The surveillance in *McGarrah* demonstrated claimant performing many activities he explicitly claimed he was unable to perform and activities closely related to his job duties—a far cry from the routine day-to-day activities plaintiff here was observed performing. *Id.* at 1029 (documenting claimant "climbing in and out of a pick-up truck, driving the truck without restriction, moving his head and neck without restriction, reaching and lifting a reclining chair over the truck's tailgate, carrying a large dog, lifting a large bag from the truck bed, unloading furniture from a trailer and carrying it, and stepping from the trailer to the ground").

13. Defendants admit that "plaintiff may have done these actions in the past," but summarily dismiss these claims, noting that these were not "essential functions" of his job. They fail to account for the written job description outlining his travel responsibilities, and LINA's own characterization of the position as requiring attendance at "management-level meetings and traveling to a variety of sites around the country." LINA Exhibit at 001152.

14. Plaintiff seeks a de novo review of his application for LTD benefits because LINA failed to issue a written denial to his July 25, 2002, appeal letter. The Court need not reach this issue, however, because it finds LINA's denial improper under the more deferential abuse of discretion standard.

charged employee for collection of unpaid wages or commissions). This distinction, however, is of no consequence, because the statutes are virtually identical and are to be read together. *See Chatfield v. Henderson* 252 Minn. 404, 90 N.W.2d 227, 232 (1958). Plaintiff has no recourse under either statute because the disability payments he seeks are not "wages." Plaintiff offers no case law supporting his implicit assumption that STD payments are wages, and offers no basis upon which to find them so. Accordingly, plaintiff's claims for wages under either §§ 181.13 or 181.14 fail. This determination also precludes an award of statutory attorneys' fees.

### III. *Conclusion*

Based upon the record before the Court, defendants' denial of disability benefits was an abuse of discretion. Accordingly,

1. Plaintiff's motion for summary judgment [Docket No. 44], as it relates to the STD claim and LTD claim is granted.

2. Defendant Honeywell's motion for summary judgment [Docket No. 51] as it relates to the STD claim and LTD claim is denied.

3. LINA's motion for summary judgment [Docket No. 47] as it relates to the STD claim and LTD claim is denied.

4. Plaintiff's motion for summary judgment on Minn.Stat. § 181.14 claim [Docket No. 61] is denied.

IT IS SO ORDERED.